**UNITED STATES**

v.

**Jerome MACKEY and William Nelson, Defendants.**

**No. 75 CR 468.**

United States District Court, E. D. New York.

Nov. 14, 1975.

David G. Trager, U. S. Atty., Eastern District of New York by Harold J. Friedman, Asst. U. S. Atty., for Government.

Groman, Wolf & Ross, P. C., Carle Place, N. Y. by Marvin Wolf, Carle Place, N. Y., for defendant Mackey.

McCarthy, Dorfman & Brenner, Mineola, N. Y. by David W. McCarthy, Mineola, N. Y., for defendant Nelson.

MEMORANDUM and ORDER

WEINSTEIN, District Judge.

The defendants, Jerome Mackey and William Nelson, were charged with mail fraud arising from their management of Mackey Distributors, Inc. 18 U.S.C. § 1341. Distributors was organized in 1972 for the purpose of selling stereo tape distributorships. Mackey was president and Nelson secretary-treasurer.

During the course of the grand jury investigation the government called as a witness an attorney, Thomas Mazza. Mr. Mazza testified that he had been retained by Jerome Mackey to draw the incorporation papers for Distributors. The testimony was relevant since it showed that Jerome Mackey took an active interest in the new corporation; this made it more likely that he would know of the fraudulent promises made by its salesmen.

The defendants contend that Mazza's testimony violated the attorney-client privilege. Having been found guilty by a jury, they renew their motion to dismiss the indictment. As indicated below, this motion must be denied because the existence of a privilege is doubtful, but even if the privilege had been violated, a dismissal would be unwarranted.

I.

CLAIM OF PRIVILEGE

Defendants' claim of privilege requires consideration of the effect of the new Federal Rules of Evidence. The grand jury proceedings in question took place on June 5, 1975. The Rules of Evidence were enacted effective July 1, 1975. Pub.L. No. 93–595, 88 Stat. 1926–1949. The trial was commenced on September 29, 1975. In the preamble to the Act, the usual escape clause is found allowing the prior rules of evidence to operate in pending litigations where the Rules "would not be feasible, or would work injustice." The preamble reads in part as follows:

"These rules apply to actions, cases, and proceedings brought after the rules take effect. These rules also apply to further procedure in actions, cases, and proceedings then pending, except to the extent that application of the rules would not be feasible, or would work injustice, in which event former evidentiary principles apply."

Since the grand jury proceedings were completed prior to the Rules having taken effect, and the motion is

directed at those grand jury proceedings rather than at the proceedings during the trial, it would be reasonable to apply "former evidentiary principles." The United States Attorney who was conducting the grand jury proceedings should obviously not be charged with any failure with respect to a rule subsequently adopted. No Rule of Evidence in effect at the time of trial was violated because the testimony of the attorney was not offered at the trial. Nevertheless, as we shall show below, there is no difference of substance between the principles governing the instant case under the Federal Rules of Evidence and prior practice.

■ In understanding what those prior practices are it is useful to consider the present Rules of Evidence. Drafted as they were by an Advisory Committee whose members were actively engaged in litigation and approved by the Supreme Court, which is itself engaged in reviewing litigation, as well as by Judiciary Committees of Congress made up of attorneys who were aware of prior practice, the Rules in general are consonant with prior procedure. In turn, earlier practices are useful in interpreting the meaning of the Rules themselves. We know, too, that on the floor of the Congress the debate on the Rules was limited to a relatively small group of Congresspersons and Senators who were, in fact, particularly concerned with, and learned in, the arts of litigation. Thus, all those involved in the creation and enactment of the Federal Rules of Evidence were learned in the law. We may, in general, assume, therefore, unless otherwise indicated by legislative history or Advisory Committee commentary, that the enacted Rules reflect the learning and experience of the drafters under prior practice. Accordingly, in the discussion which follows we have relied heavily on the present Federal Rules of Evidence as explicating practice at the time the grand jury met.

■ There is no question that under the Federal Rules of Evidence the at-torney-client privilege applies to grand jury proceedings. Rule 1101(c) expressly states that "[t]he rule with respect to privileges applies at all stages of all actions, cases, and proceedings." In addition, Rule 1101(d), which provides that the Rules of Evidence shall not apply to proceedings before grand juries, specifically excepts the Rules governing privileges.

While the Supreme Court promulgated a comprehensive article covering privileges, including that for attorneys and clients, Congress eliminated specific references to any privileges. Compare 56 F.R.D. 184, 230 ff. (1973) with Article V of the Federal Rules of Evidence. The only provision of the enacted Rules covering testimonial privileges in criminal cases embodies "principles of the common law" as "interpreted by the courts of the United States in the light of reason and experience." It reads:

"Rule 501.

### General Rule

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law."

Despite their deletion by Congress, the privilege rules promulgated by the Supreme Court remain of considerable utility as standards. Congress expressed no disagreement with their substance; it eliminated them primarily because they were considered substantive in na-

ture and not a fit subject for rule making.

The specific Rules on privilege promulgated by the Supreme Court are reflective of "reason and experience." They are the culmination of three drafts prepared by an Advisory Committee consisting of judges, practicing lawyers and academicians. In its many years of work, the Committee considered hundreds of suggestions received in response to the circulation of the drafts throughout the legal community. Finally, they were adopted by the Supreme Court by an eight to one vote. The rule against advisory opinions is only slightly more violated by giving weight to this vote than it would have been had Congress not vetoed these provisions, and had they become "Rules," rather than "standards."

As its commentary indicates, the Advisory Committee in drafting the privilege rules was for the most part restating the law applied in the federal courts. These rules or standards, therefore, are a convenient comprehensive guide to the federal law of privileges as it now stands, subject of course to a considerable flexibility of construction.

■ The attorney-client privilege was covered by the Supreme Court's Rule 503. The Rule, significantly, tracks the common law in the sense that it applies only to "confidential communications." A litigant is entitled to object to adverse testimony by a former attorney only when such testimony would tend to reveal matters disclosed by the litigant in confidence. Subdivision (b) of this Rule stated:

"(b) General rule of privilege. A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between himself or his representative and his lawyer or his lawyer's representative, or (2) between his lawyer and the lawyer's representative, or (3) by him or his lawyer to a lawyer representing another in a matter of common interest, or (4) between representatives of the client or between the client and a representative of the client, or (5) between lawyers representing the client."

The minutes of Mazza's testimony before the grand jury reveal very little, if anything, that would qualify as a confidential communication from the defendant Mackey. In substance, Mazza's testimony brought five relevant facts to the attention of the grand jury: 1) in 1972 Mazza represented Jerome Mackey in the formation of Distributors; 2) Mazza filed the certificate of incorporation and was the sole incorporator; 3) he prepared a corporate kit consisting of various documents which he retained until June 7, 1973, at which time he turned the kit over to an employee of Jerome Mackey; 4) he first became aware that Distributors was owned by Jerome Mackey Judo, Inc., another corporation in which Jerome Mackey had an interest, in the fall of 1972; and 5) at that time he prepared an agreement whereby Judo would sell 100% of its stock to Nelson and another person. According to Mazza his sole source for the information contained in this contract was either Jerome Mackey or an employee of Jerome Mackey.

■ The employee was a necessary intermediary to transmit the information. See Supreme Court Rule 503(b) (1). Apparently Nelson was never a client and would have no standing to rely on the privilege. In the discussion which follows we shall treat the claim as one by Jerome Mackey only.

Since the minutes indicate that Mazza believed he was acting for Jerome Mackey personally rather than for Jerome Mackey Judo, Inc., we also make that assumption in the analysis which follows. Under other circumstances this issue might present a critical question of fact, requiring a hearing.

■ The courts have held that ordinarily the concept of a confidential

communication does not include the identity of a client or the fact that someone has become a client. *Colton v. United States,* 306 F.2d 633 (2d Cir. 1962), *cert. denied,* 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963); *United States v. Pape,* 144 F.2d 778, 782–83 (2d Cir.), *cert. denied,* 323 U.S. 752, 65 S.Ct. 86, 89 L.Ed. 602 (1944); *Behrens v. Hironimus,* 170 F.2d 627 (4th Cir. 1958); *Goddard v. United States,* 131 F.2d 220 (5th Cir. 1942); 8 Wigmore, Evidence § 2313 (McNaughton rev. 1961); McCormick, Evidence § 90 (Cleary ed. 1972). *See also, In re Grand Jury Proceedings, United States v. Jones,* 517 F.2d 666 (5th Cir. 1975). This Circuit has held that the privilege does not prohibit testimony concerning the general nature of the services performed by the attorney. *Colton v. United States, supra.* There is no reason in this case to depart from the general rule. Facts 1, 2, and 3 above, simply relating that certain corporate documents were drawn at the behest of Jerome Mackey, were not privileged from disclosure before the grand jury.

■ The fact that Jerome Mackey Judo, Inc. at one point owned all of Distributors' outstanding stock was nationally publicized and utilized by defendants' salesmen as a selling point when attempting to sell distributorships to potential customers. All the non-privileged evidence showed that this was accomplished with Jerome Mackey's consent. Hence, there can be no claim that that information was given to Mazza in confidence.

This leaves only that portion of Mazza's testimony which indicates that Nelson and another, one Taylor, were to purchase Jerome Mackey Judo, Inc.'s stock in Distributors. We assume for this discussion that Jerome Mackey, the client, told this to Mazza; had the information come from the non-clients, Nelson or Taylor, there would be no privilege.

One of the central allegations of fraud involved in this case is that the defendants permitted potential customers to think that Distributors was a wholly owned subsidiary of Jerome Mackey Judo, Inc. at a time when Nelson and Taylor owned its stock. Thus, this testimony may have helped persuade the grand jury to indict. The first issue, then, is whether this communication from Mackey may be deemed confidential for purposes of the privilege.

■ A corporation is subject to the visitorial powers of the government. A corporate officer or agent holds its books and records subject to examination by authorized representatives of the government. Morgan, Basic Problems of Evidence, 162 (4th ed.1963). An officer, for example, is generally not entitled by reason of his privilege against self-incrimination to refuse to produce books and records owned by the corporation. *Essgee Co. of China v. United States,* 262 U.S. 151, 43 S.Ct. 514, 67 L.Ed. 917 (1923); *cf. Bellis v. United States,* 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974). Thus the names of shareholders, which are clearly a matter of corporate record, are not normally the kind of confidential information which is subject to the attorney-client privilege. This is true even of a closely held corporation such as Distributors. This case, then, would seem analogous to situations in which the courts have denied a claim of privilege on the ground that information had been given to an attorney with the understanding that it could be transmitted to others. *See e. g., Colton v. United States,* 306 F.2d 633, 638 (2d Cir. 1963), *cert. denied,* 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963); *United States v. Tellier,* 255 F.2d 441, 447 (2d Cir.), *cert. denied,* 358 U.S. 821, 79 S.Ct. 33, 33 L.Ed.2d 62 (1958); 8 Wigmore, Evidence § 2311 (McNaughton rev. 1961); McCormick, Evidence § 91 (Cleary ed. 1972).

■ It is perhaps arguable that Jerome Mackey and Mazza understood that the purchase of Distributor stock by Nelson and Taylor would not be bruited about indiscriminately, though they

must have realized that stock ownership would have to be revealed for tax and regulatory purposes. If so, Mazza may have been under an ethical obligation to maintain the confidentiality of that information against non-governmental inquiry. A.B.A. Code of Professional Responsibility, Canon 4. Certainly, he would have been wrong to circulate this intelligence for commercial purposes without his client's consent. But a lawyer's ethical obligation to protect clients' confidences against the world are broader than his obligation—or right as defined by the privilege—to withhold information from a court.

If complete secrecy with respect to the transfer of shares was the intention from the outset it could be argued that there was no privilege. By the fall of 1972 Jerome Mackey would have known that the salesmen's strong selling point was that Distributors was "credible" and reliable because it was a subsidiary of the publicly held Jerome Mackey Judo, Inc. To have deliberately kept the transfer secret would have been, under the circumstances, to have aided a fraud.

Communications in aid of fraud are not privileged. As the Supreme Court's Rule 503(d) put it:

"(d) Exceptions. There is no privilege under this rule:

(1) Furtherance of crime or fraud: If the services of the lawyer were sought or obtained to enable or aid anyone to commit what the client knew or reasonably should have known to be a crime or fraud; . . ."

Nevertheless, it cannot be said that the claim of privilege is without some force. Arguably we are on the borderline of the privilege. At any rate, as explicated below, for the purposes of this motion to dismiss we can assume, without deciding, that the communication might be deemed privileged.

## II.

## POWER OF THE COURT TO DISMISS THE INDICTMENT

The case law governing grand jury practice suggests three conceptual bases upon which dismissal of the indictment might be predicated when a defendant's evidentiary privilege is violated before the grand jury. None assist the defendant.

First is the attorney-client privilege itself. The theory is simple enough— just as the admission into evidence at trial of testimony which violates the privilege might be ground for reversal, so too admission of such evidence might warrant dismissal of the indictment. 8 Wigmore, Evidence § 2364 (McNaughton rev. 1961). In short, the right implies an appropriate remedy.

We have found no federal cases raising this precise issue. There is some authority, however, bearing on the consequences of a grand jury's violation of a defendant's constitutional privilege against self-incrimination. *United States v. Lawn,* 115 F.Supp. 674 (S.D. N.Y.1953), *appeal dismissed as untimely sub nom., United States v. Roth,* 208 F.2d 467 (2d Cir. 1953), was a prosecution for wilfully causing a corporation to fail to pay income taxes. An initial information had been filed against several defendants in 1950. In 1952, they were called before a grand jury conducting a further investigation into the same charges. All testified and one defendant produced partnership records. All this evidence was incriminatory. The court held that the defendants had a right to invoke their constitutional privilege against self-incrimination before the grand jury and that in the absence of a specific warning that right had not been waived. The court further noted that it would be a clear violation of the privilege to compel the defendants to testify and produce records at a trial and concluded that

"for similar reasons, an indictment is invalid if a defendant against whom a

criminal information has been filed, is called by the prosecution as a witness before the grand jury to obtain evidence tending to sustain an indictment against him, which supersedes the earlier information."

115 F.Supp. at 677. The court, accordingly, dismissed the indictment. The quoted language—analogizing the grand jury right to the trial right—lends some support to defendants' position here.

The Supreme Court, however, shortly thereafter, seemingly rejected the district court's approach in a related case. *Lawn v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). The government had obtained an indictment against the same defendants which superseded the one dismissed by the district court. This new indictment was the product of a separate grand jury investigation. The defendants again moved for dismissal and, in the alternative, for a hearing and for inspection of the grand jury minutes in order to determine whether the government, in procuring the indictment, had used testimony or documents produced before the first grand jury or evidence obtained through leads and clues.

The Court affirmed the district court's denial of this motion on the ground that defendants' affidavits and submissions did not support an inference that the government had made any use of the defendants' prior testimony and documents. But, in rather sweeping dicta, it went on to suggest that government use of that evidence would not have warranted dismissal of the indictment, in any event. Relying principally on *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), discussed below, the Court said:

" . . . [t]his Court has several times ruled that one indictment returned by a legally constituted nonbiased grand jury, like an information drawn by a prosecutor, if valid on its face, is enough to call for a trial of the charge on the merits and satisfies

the requirements of the Fifth Amendment.

. . . . . .

It should be unnecessary to say that we are not here dealing with the use of incompetent or illegal evidence in a trial on the merits, nor with the right to decline to give incriminating testimony in legal proceedings or to suppress the direct or derivative use at the trial of evidence illegally obtained."

355 U.S. at 349–350, 78 S.Ct. at 317–318.

The distinction drawn between the status of the privilege at trial and before the grand jury is critical. For, although the precise holding of the case was that petitioners were not entitled to a "preliminary hearing to enable them to satisfy their unsupported suspicions," 355 U.S. at 350, 78 S.Ct. at 318, the Court has very recently cited *Lawn* for the proposition that "an indictment valid on its face is not subject to challenge on the ground that the grand jury acted . . . on the basis of information obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination." *United States v. Calandra*, 414 U.S. 338, 345, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974).

■ It would seem to follow, *a fortiori*, that the right to invoke a common law testimonial privilege, which does not stand on a constitutional footing, does not imply any right to a dismissal of an indictment. The only limitation on this principle has been the suggestion by some courts that an indictment is invalid if it could not be supported without the privileged matter. *See United States v. James*, 493 F.2d 323 (2d Cir.), *cert. denied*, 419 U.S. 849, 95 S.Ct. 87, 42 L.Ed.2d 79 (1974); *United States v. Pepe*, 367 F.Supp. 1365, 1370 (D.Conn.1973). *See also People v. Eckert*, 2 N.Y.2d 126, 128, 157 N.Y.S.2d 551, 554, 138 N.E.2d 794, 796 (1956) (admission of doctor's testimony in violation of defendant's privilege was im-

proper but indictment would not be dismissed where there was sufficient competent evidence also presented to the grand jury).

In the instant case, there was overwhelming evidence of defendants' mail fraud presented to the grand jury apart from Mazza's testimony. Mere violation of the attorney-client privilege would not support dismissal.

A second theoretical basis for dismissal is that portion of the Fifth Amendment which guarantees that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S.Const. Amend. V. The theory here would be that this constitutional protection assumes that the grand jury will conform to the law and confine its deliberations to competent or otherwise legally obtainable evidence. This approach was largely rejected by the Supreme Court in *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). In *Costello* the defendant moved to dismiss the indictment on the ground that the only witnesses to appear before the grand jury were three government investigators who had no first hand knowledge of the acts of tax evasion with which defendant was charged and who were only able to repeat the hearsay declarations of others. Costello argued that an indictment based solely on hearsay violated the Fifth Amendment grand jury provision.

The Court based its analysis primarily on the practices of the early English grand jury.

"The basic purpose of the English grand jury was to provide a fair method for instituting criminal proceedings against persons believed to have committed crimes. Grand jurors were selected from the body of the people and their work was not hampered by rigid procedural or evidential rules. In fact, grand jurors could act on their own knowledge and were free to make their presentments or in-

dictments on such information as they deemed satisfactory."

350 U.S. at 362, 76 S.Ct. at 408.
The Court concluded that:

"If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more."

350 U.S. at 363, 76 S.Ct. at 408–409.

Fairly read, *Costello* may be said to stand for the proposition that the validity of an indictment under the Fifth Amendment is in no way dependent on the legality of the evidence received by the grand jury. Arguably, however, the facts if not the language of *Costello* are distinguishable in the sense that there defendant's contention went essentially to the reliability and, hence, the sufficiency of the evidence presented to the grand jury. In this case, by contrast, defendant's objection centers on the violation of his right to confidential communication with his attorney—i. e., on the legality of the government's conduct in obtaining the evidence, in the first instance.

In this connection, the Court's recent decision in *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), affords some additional insight. Calandra had obtained an order from a district court providing that he need not answer a grand jury's questions which were based upon records seized from his place of business in violation of the Fourth Amendment. The

Supreme Court reversed the Sixth Circuit's affirmance, holding that at least where there has not been a prior adjudication that evidence has been illegally seized, a witness who has not been indicted may not invoke the exclusionary rule to secure suppression of evidence nor relief from the duty to testify. *See esp.* n. 8, 414 U.S. at 352, 94 S.Ct. at 622. It is true that the question in *Calandra* was the existence of a right to exclude evidence before the grand jury —a right assumed here—and that the primary rationale for the decision was the majority's view of limitations on the exclusionary rule. 414 U.S. at 347–355, 94 S.Ct. at 619–624. But it is hardly likely that the Court would permit the introduction of illegally seized evidence if it anticipated the dismissal of a resulting indictment on the basis of the Fifth Amendment. This observation, coupled with the reliance placed on its own decision in *Lawn v. United States,* noted above, indicates that the Court perceives no limitations inherent in the Fifth Amendment on the kind of evidence that may be considered by a grand jury.

The conclusion that an indictment is not invalidated by grand jury reception of illegally obtained evidence is further supported by dicta in *United States v. Blue,* 384 U.S. 251, 255 n. 3, 86 S.Ct. 1416, 1419, 16 L.Ed.2d 510 (1966) and by a broad consensus of lower court authority. *See, e. g., United States v. Doe,* 455 F.2d 1270, 1274 (1st Cir. 1972); *United States ex rel. Almeida v. Rundle,* 383 F.2d 421, 424 (3d Cir. 1967), *cert. denied,* 393 U.S. 863, 89 S.Ct. 144, 21 L.Ed.2d 131 (1968); *United States v. Johnson,* 419 F.2d 56, 58 (4th Cir. 1969), *cert. denied,* 397 U.S. 1010, 90 S.Ct. 1235, 25 L.Ed.2d 423 (1970); *Hunter v. United States,* 405 F.2d 1187 (9th Cir. 1969).

A number of cases suggest that it may be necessary to dismiss an indictment based entirely on tainted evidence, *see e. g., Laughlin v. United States,* 128 U.S.App.D.C. 27, 385 F.2d 287, 291 (1967), *cert. denied,* 390 U.S. 1003, 88 S.Ct. 1245, 20 L.Ed.2d 103 (1968);

*United States v. Kahn,* 366 F.2d 259, 264 (2d Cir.), *cert. denied sub nom., Pacelli v. United States,* 385 U.S. 948, 87 S.Ct. 321, 324, 17 L.Ed.2d 226, *reh. denied,* 385 U.S. 984, 87 S.Ct. 502, 503, 17 L.Ed.2d 445 (1966); *United States v. Isaacs,* 347 F.Supp. 743, 757 (N.D.Ill.1972); *United States ex rel. Pacheco v. Casseles,* 312 F.Supp. 554, 556 (S.D.N.Y.1970). As noted, this is not the case here.

A third basis for dismissal of the indictment would be in the exercise of inherent "supervisory powers" over the conduct of government attorneys before the grand jury. *See United States v. Estepa,* 471 F.2d 1132, 1136 (2d Cir. 1972).

The Supreme Court in *Costello,* however, specifically held that this power should not be exercised so as to permit defendants to challenge indictments on the ground that they are not supported by competent evidence. The Court concluded that:

"[n]o persuasive reasons are advanced for establishing such a rule. It would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules. Neither justice nor the concept of a fair trial requires such a change. In a trial on the merits, defendants are entitled to a strict observance of all the rules designed to bring about a fair verdict. Defendants are not entitled, however, to a rule which would result in interminable delay but add nothing to the assurance of a fair trial."

350 U.S. at 364, 76 S.Ct. at 409.

Given that dismissal of the indictment is not required by the court's interests in reliable fact finding by the grand jury or in preserving fairness to the defendant, it follows that the exercise of the court's supervisory power to dismiss can only be justified by extrinsic policy considerations—specifically, the policy considerations underlying that portion of Rule 1101(d) of the Federal Rules of Evidence which, in con-

junction with Rule 1101(c), preserves the common law privileges in grand jury proceedings.

Although the Advisory Committee which drafted the Federal Rules was explicit in setting forth the reasons for not applying the rules of evidence to grand jury proceedings—relying on the quotations from *Costello* set out above—the Committee did not provide similar guidance on why the rules of privilege were excepted from that policy. *See* Advisory Committee Notes to Rule 1101(c) and (d). Pre-Federal Rules of Evidence cases which have either upheld or recognized the right to invoke a testimonial privilege in a grand jury proceeding are likewise silent as to the reasons for doing so. *See, United States v. Pappadio,* 346 F.2d 5, 9 (2d Cir. 1965) (attorney client privilege), *vacated sub nom., Shillitani v. United States,* 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); *In re Goldman,* 331 F.Supp. 509 (W.D.Pa.1971) (attorney-client privilege); *Blau v. United States,* 340 U.S. 332, 71 S.Ct. 301, 95 L.Ed. 306 (1951); *United States v. George,* 444 F.2d 310 (6th Cir. 1971) (marital privilege); *In re Verplank,* 329 F.Supp. 443 (C.D.Cal.1971) (priest-penitent privilege).

The preservation of the traditional testimonial privileges in the grand jury context is consistent with several policy objectives. One function of the rule is to preserve the secrecy of confidential communications. Subdivision (c) of Rule 1101 supports the view that confidentiality once destroyed cannot be restored, and that a privilege is effective only if it bars all disclosures at all times. Nevertheless, in the grand jury context, this unquestionably serious concern about protecting important relationships is substantially mitigated by several factors. Rule 6(e) of the Federal Rules of Criminal Procedure imposes a strict obligation of secrecy on all jurors, attorneys, interpreters, stenographers, operators of recording devices and typists involved in a grand jury proceeding. Such persons may disclose matters occurring before the grand jury only to government attorneys for use in the performance of their duties or as otherwise directed by the court. *See* 1 C. Wright, Federal Practice and Procedure [Criminal] § 106 (1969). It is true that no such obligation is imposed on the witness, but there is no reason to assume that testifying before a grand jury will render a privileged communicant more likely to disclose confidential matter in the future.

At trial additional protections come into play. It is axiomatic that a testimonial privilege can be waived only by the holder. Accordingly, the revelation of privileged matter before the grand jury by an attorney, for example, would not constitute a waiver of the client's privilege so as to entitle the government to introduce that matter at trial. Supreme Court Rule 512 expressly provided that a disclosure of privileged information is not admissible against a holder who had no opportunity to claim the privilege. The rule provided:

"Rule 512.

Privileged Matter Disclosed Under Compulsion or Without Opportunity to Claim Privilege.

Evidence of a statement or other disclosure of privileged matter is not admissible against the holder of the privilege if the disclosure was (a) compelled erroneously or (b) made without opportunity to claim the privilege."

Since the defendant Jerome Mackey was not before the grand jury when the testimony was given, he had no opportunity to claim the privilege. He would have been entitled, therefore, to object to Mazza's testimony at trial had it been offered by the government. It is also significant that where the holder of the privilege is called before the grand jury and compelled erroneously to testify, Supreme Court Rule 512 would provide that no waiver occurs.

Congress struck Rule 512 but, as already noted, the provision still is useful as a standard. Accordingly, the defendant would retain his right to invoke the privilege at trial, either to exclude testimony by the communicant or to bar introduction of his own prior statement as an admission. In addition, the court would have some discretion to bar the fruit of the privileged testimony, at least where the government was a party to the improper breach.

Finally, Supreme Court Rule 513 would prohibit any comment on the claim of privilege. The rule, as promulgated by the Supreme Court but not adopted by Congress, stated

"Rule 513.

### COMMENT UPON OR INFERENCE FROM CLAIM OR PRIVILEGE: INSTRUCTION

(a) Comment or inference not permitted. The claim of a privilege, whether in the present proceeding or upon a prior occasion, is not a proper subject of comment by judge or counsel. No inference may be drawn therefrom.

(b) Claiming privilege without knowledge of jury. In jury cases, proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege without the knowledge of the jury.

(c) Jury instruction. Upon request, any party against whom the jury might draw an adverse inference from a claim of privilege is entitled to an instruction that no inference may be drawn therefrom."

This approach is in accord with pre-existing practice in the federal courts. See, e. g., Courtney v. United States, 390 F.2d 521, 527 (9th Cir.), cert. denied, 393 U.S. 857, 89 S.Ct. 98, 21 L.Ed. 2d 126, rehearing denied, 393 U.S. 992, 89 S.Ct. 440, 21 L.Ed.2d 457 (1968).

In sum, there exist substantial safeguards which guarantee continued secrecy for confidential communications improperly disclosed to a grand jury. Dismissal of an indictment would add little to these protections.

A second objective of Rules 1101(c) and (d) may be to supplement the traditional function of the privileges themselves in encouraging the formation of protected confidential relationships and free and frank discussion within those relationships. See, e. g., Wigmore, Evidence §§ 2285, 2286, 2290, 2291, 2332, 2333 (McNaughton rev. 1961); McCormick, Evidence §§ 72–74, 78, 87, 98 (Cleary ed. 1972). It should be observed, however, that only a small fraction of attorneys, spouses, physicians, and other privileged communicants are called before grand juries. Those that are called are already guaranteed their authority to claim the privilege by Rule 1101. Attorneys, in particular, are under a professional ethical obligation to refuse to disclose confidential matters. A.B.A. Code of Professional Responsibility, Canon 4. Their training should alert them to the issue so that inadvertent breaches are unlikely. See, In re Stolar, 397 F.Supp. 520 (S.D.N.Y.1975); United States v. Mitchell, 372 F.Supp. 1239 (S.D.N.Y.1973); In re Terkeltoub, 256 F.Supp. 683 (S.D.N.Y.1966). It would thus appear that a rule guaranteeing dismissal of an indictment should a privilege be erroneously breached would constitute, at best, a wholly speculative, marginal incentive to the formation of confidential relationships. In United States v. Calandra, supra, the Court refused to extend the exclusionary rule to grand juries because of the slight incremental deterrent impact on police misconduct of such extension.

The preservation of the testimonial privileges in grand jury proceedings also serves to prevent governmental interferences with the protected relationships. An attorney or spouse, for instance, is very often a fertile source of incriminatory information. Without the Rule a privileged communicant called as a witness would face the problem of choosing between disclosing confidential matter, testifying falsely, and possibly incurring contempt by remaining silent. It is at

least arguable that the risk of a dismissal of any resulting indictment is the only effective means of discouraging zealous prosecutors from improperly seeking privileged matter for grand juries in violation of Rules 1101(c) and (d). If valid, such an hypothesis would directly support the exercise of the court's supervisory power. In this connection, a line of Second Circuit decisions dealing with the use of hearsay in grand jury proceedings is particularly instructive.

In *United States v. Umans*, 368 F.2d 725 (2d Cir. 1966), *cert. granted*, 386 U.S. 940, 87 S.Ct. 975, 17 L.Ed.2d 872, *cert. dismissed as improvidently granted*, 389 U.S. 80, 88 S.Ct. 253, 19 L.Ed.2d 255 (1967), the court strongly admonished the government not to make excessive use of hearsay:

> "While we are not condemning the procedure used here before the grand jury, we think it not amiss for us to state that excessive use of hearsay in the presentation of government cases to grand juries tends to destroy the historical function of grand juries in assessing the likelihood of prosecutorial success and tends to destroy the protection from unwarranted prosecutions that grand juries are supposed to afford to the innocent. Hearsay evidence should only be used when direct testimony is unavailable or when it is demonstrably inconvenient to summon witnesses able to testify to facts from personal knowledge."

368 F.2d at 730.

In *United States v. Arcuri*, 282 F.Supp. 247 (E.D.N.Y.), *aff'd*, 405 F.2d 691 (2d Cir. 1968), *cert. denied*, 395 U.S. 913, 89 S.Ct. 1760, 23 L.Ed.2d 227 (1969), this court, after reviewing the decisions, refused to overturn an indictment, despite the unjustified reliance on hearsay by the government, because the grand jury could not possibly have failed to indict on the basis of the non-hearsay evidence. But the government's continuing failure to comply with the Second Circuit's admonition in *Umans* was felt to warrant a stronger rule and more uniformly applied sanctions. It was held that a timely motion to dismiss an indictment handed down after March 31, 1968 would be granted without a showing of prejudice to the defendant if it were clear that hearsay alone was deliberately relied upon when better evidence was readily available. This local dismissal rule has been exercised on at least one occasion. *See United States v. Chesimard*, 72 CR 5 (oral decision) (E.D.N.Y.1975).

Finally, in *United States v. Estepa*, 471 F.2d 1132 (2d Cir. 1972), the Court of Appeals ordered an indictment dismissed because of the deliberate and misleading presentation of hearsay to the grand jury. The court reached the conclusion that the time had arrived for the exercise of its supervisory power on the basis of the following considerations:

> "We had hoped that, with the clear warnings we have given to prosecutors, . . . and the assurances given by United States Attorneys, . . . a reversal for improper use of hearsay before the grand jury would not be required. Here the Assistant United States Attorney, whether wittingly or unwittingly—we prefer to think the latter, clearly violated the first of these provisos. We cannot, with proper respect for the discharge of our duties, content ourselves with yet another admonition; a reversal with instructions to dismiss the indictment may help to translate the assurances of the United States Attorneys into consistent performance by their assistants."

471 F.2d at 1136–37.

The upshot of these decisions is that just as a court may exercise its supervisory powers to enforce the standards of prosecutorial conduct implicit in the Fifth Amendment grand jury guarantee, so too, the court may exercise those powers to enforce the standards of prosecutorial conduct contemplated by Rule 1101(c) and (d) of the Federal Rules of Evidence. But, in determining whether to quash a facially valid indictment, the

court must weigh the added deterrent effect of a dismissal against the substantial countervailing considerations articulated by the Supreme Court in *Costello*. Such an assessment turns, for the most part, on the deliberateness of the government's conduct, the egregiousness of the violation, and the extent to which the defendant has been prejudiced. In the absence of these factors, the court should consider whether the challenged practice contravenes an outstanding judicial admonition or a prior statement of policy by the government.

Other cases have adopted a similar discretionary approach to the exercise of the court's supervisory power where similar values have been threatened by prosecutorial misconduct. *See, United States v. Fox*, 425 F.2d 996, 1001 (9th Cir. 1970) (motion to quash indictment on ground that prosecutor had inaccurately informed grand jury that defendant had a long record addressed to discretion of trial court; discretion not abused where other competent evidence had been presented to the grand jury and misrepresentation by prosecution was not deliberate); *United States v. Tane*, 329 F.2d 848, 853–4 (2d Cir. 1964) (trial court had discretion to dismiss indictment based wholly on testimony procured as fruit of illegal wiretap); *United States v. Thomas*, 342 F.2d 132 (6th Cir.), *cert. denied*, 382 U.S. 855, 86 S.Ct. 105, 15 L.Ed.2d 92 (1965) (motion to dismiss indictment on ground that presentation of testimony to grand jury violated prior promise by government not to use certain evidence against defendants properly denied where other competent evidence had been presented, but some counts quashed); *United States v. Pepe*, 367 F.Supp. 1365 (D. Conn.1973) (although dismissal of indictment not required for violation of defendant's privilege against self-incrimination, court would exercise discretion to dismiss where prosecutor's conduct was deliberate and flagrant); *United States v. Abbott Laboratories*, 369 F.Supp. 1396 (E.D.N.C.1973) (indictment dismissed because prosecutor deliberately introduced by questions and remarks irrelevant evidence designed to inflame grand jury and create prejudice).

By any of these standards, the indictment in this case should not be dismissed. The claim of privilege here is at best tenuous. Defendants have not alleged that the government acted with bad faith in questioning Mr. Mazza. The Assistant United States Attorney who handled this case has presented an affidavit which discloses that he and Mr. Mazza carefully considered in advance the problems raised by the attorney-client privilege and concluded after discussion that Mr. Mazza's testimony would not disclose confidential matters. Moreover, the defendants were not meaningfully prejudiced by Mr. Mazza's appearance. Even in the absence of his testimony, the grand jury could not conceivably have failed to indict.

## III.

## OBLIGATION OF UNITED STATES ATTORNEY

 To comply with the protective policies of Rule 1101 the United States Attorney should not knowingly violate a privilege before the grand jury. He should be sensitive to possible problems. If there is any substantial possibility of a valid claim of privilege he should bring this fact to the attention of the witness, advising the witness of the right to consult counsel; to have the court appoint a lawyer if he cannot afford one; to refuse to answer questions if he believes a privilege may be involved; and to be brought before the court for a ruling.

The policy of the United States Attorney for the Eastern District of New York apparently is to comply with these guidelines. He and his staff, so far as this court is aware, follow the American Bar Association's Standards Relating to the Prosecution Function (Approved Draft 1971). Standard 3.6 provides:

"Quality and scope of evidence before grand jury.

(a) A prosecutor should present to the grand jury only evidence which he be-

lieves would be admissible at trial. However, in appropriate cases the prosecutor may present witnesses to summarize admissible evidence available to him which he believes he will be able to present at trial."

*See also,* Standards 3.1(a), 3.5(b).

## IV.

## CONCLUSION

There is no suggestion that the United States Attorney for the Eastern District of New York deliberately and improperly placed privileged information before the grand jury. The indictment was supported by ample non-privileged evidence. Accordingly, the motion to dismiss the indictment is denied.

So ordered.