### In Re: GRAND JURY INVESTIGATION

**United States of America, Movant–Appellee,**

v.

**John Doe, Interested–Party–Appellant.**

**Docket No. 04–2287–CV.**

United States Court of Appeals, Second Circuit.

Argued June 22, 2004.

Decided Feb. 22, 2005.

Ross H. Garber (Melinda M. Decker, on the brief), Office of the Governor of Connecticut, Hartford, CT, for Interested–Party–Appellant.

Eric J. Glover, Assistant United States Attorney (John H. Durham, Deputy United States Attorney for the District of Connecticut, Nora R. Dannehy, Assistant United States Attorney, William J. Nardini, Assistant United States Attorney, on the brief), New Haven, CT, for Movant–Appellee.

Before: WALKER, Chief Judge, JACOBS and LEVAL, Circuit Judges.

JOHN M. WALKER, JR., Chief Judge.

This opinion follows our expedited order of August 25, 2004, reversing an order of the United States District Court for the District of Connecticut (Robert N. Chatigny, *Chief Judge*) that would have compelled the former chief legal counsel in the Office of the Governor of Connecticut to reveal to a federal grand jury the contents of private conversations she had with the Governor and various members of his staff for the purpose of providing legal advice. We now explain the reasoning in support of the order.

## BACKGROUND

On February 19, 2004, in the course of investigating possible criminal violations by Connecticut public officials and employees, and by private parties with whom the state had done business, a federal grand jury subpoenaed the testimony of Anne C. George, former chief legal counsel to the Office of the Governor of Connecticut. George served in that position from August 2000 to December 2002 and before that as deputy legal counsel. During the period leading up to issuance of the subpoena, the U.S. Attorney's Office ("the Government") had been investigating, in particular, whether Governor Rowland[1]

1. The identity of former Governor Rowland was initially protected by the "John Doe" appellation and by various orders sealing the district court proceedings and those in this court. On December 23, 2004, Rowland pleaded guilty to one count of conspiracy to

and members of his staff had received gifts from private individuals and entities in return for public favors, including the favorable negotiation and awarding of state contracts. The Government had sought, through direct contact with Governor Rowland, to gain access to specified communications between Rowland, his staff, and legal counsel, all to no avail. The Government had also asked George herself to submit to a voluntary interview. She declined, however, after the Office of the Governor notified her that it believed that the information the Government was seeking was protected by the attorney-client privilege.

On March 3, 2004, prior to George's appearance before the grand jury, the Government moved in the district court to compel George to testify about the contents of confidential communications between George and Governor Rowland and members of his staff. The district court withheld decision pending George's actual appearance and assertion of the privilege before the grand jury.

On April 7, 2004, when George appeared before the grand jury, she testified that in her capacity as legal counsel to the Governor she had engaged in numerous conversations with Rowland and other members of his staff on the subject of the receipt of gifts and the meaning of related state ethics laws. George also stated that she had spoken with Rowland's former co-Chief of Staff about a practice of state contracts being sent to the Governor's Office for approval. She testified, however, that because all of these conversations were in confidence and conducted for the purpose of providing legal advice, the Office of the Governor was of the view that they were

---

commit honest services mail fraud and tax fraud. Accordingly, no purpose is served by adhering to the sealing orders and those of this court are hereby revoked.

Due to Rowland's guilty plea and the expiration of the grand jury on January 24, 2005, the Government has moved for dismissal of this appeal as moot, implicitly requesting that we vacate our August 25, 2004, order and withhold this opinion from publication. Although the appeal was not moot at the time we issued our order and this opinion merely explains the reasoning behind that order, the Government points out that the mandate has yet to issue and the appeal is thus technically still pending before our panel. This is true, it bears noting, only because on September 9, 2004, we granted the Government's motion for an extension of time to file a petition for rehearing and rehearing in banc until forty-five days after the issuance of our opinion. We find that the mootness doctrine does not require either that we vacate our prior order or refrain from issuing this opinion. At least in the civil context, vacatur of a previously issued decision of a court of appeals is not constitutionally mandated, and indeed is typically inappropriate, when the appeal is subsequently mooted due to settlement between the parties or the losing party's unilateral actions.

See U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship, 513 U.S. 18, 23–29, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994); see also Manufacturers Hanover Trust Co. v. Yanakas, 11 F.3d 381 (2d Cir.1993). We generally have discretion, moreover, to leave our order intact where the circumstances leading to mootness occur after we file our decision but before the mandate has issued. See Humphreys v. Drug Enforcement Admin., 105 F.3d 112 (3d Cir.1996) (refusing to vacate previously issued order where case was mooted following that order but prior to issuance of mandate). If this is true, it follows that we may explain the reasons behind that previously-issued decision, especially where such an explanation was contemplated in the original order. See United States v. Int'l Bhd. of Teamsters, 955 F.2d 171, 174 (2d Cir.1992) (publishing opinion promised in prior order despite termination of dispute following issuance of the order); see also Bancorp, 513 U.S. at 21, 115 S.Ct. 386 ("[R]eason and authority refute the ... notion that a federal appellate court may not take any action with regard to a piece of litigation once it has been determined that the requirements of Article III no longer are ... met.").

For the foregoing reasons, the Government's motion is denied.

protected by the attorney-client privilege, which it declined to waive. Accordingly, asserting the privilege on behalf of her client, George refused to answer questions pertaining to the content of the conversations.

On April 26, 2004, the district court entered an order compelling George's testimony. After noting that it was "undisputed that the grand jury need[ed] the information it [sought] to obtain from Ms. George," the district court concluded that "[r]eason and experience dictate that, in the grand jury context, any governmental attorney-client privilege must yield because the interests served by the grand jury's fact-finding process clearly outweigh the interest served by the privilege." The district court distinguished the "governmental" attorney-client privilege from the privilege in the context of a private attorney-client relationship, by explaining that "unlike a private lawyer's duty of loyalty to an individual client, a government lawyer's duty does not lie solely with his or her client agency," but also with the public.

Both the Office of the Governor and Rowland, as interested parties, appealed the district court's decision. We granted the Government's motion to expedite the appeal.

On June 21, 2004, one day prior to oral argument, Governor Rowland announced that he would resign as Governor, effective July 1, 2004. At argument, we asked the parties to address the question of whether Rowland's resignation would affect our disposition of the appeal. The Government subsequently informed us that it had asked Rowland's successor, Governor M. Jodi Rell, to consider waiving the privilege insofar as the privilege was held by the Office of the Governor, and requested that we defer our disposition of the appeal pending Governor Rell's decision. On August 6, 2004, the newly appointed counsel to the Office of the Governor informed us that Governor Rell declined to waive the privilege.

On August 25, 2004, for reasons we now explain, we issued an order reversing the district court.

## DISCUSSION

■ Federal Rule of Evidence 501 governs the nature and scope of a privilege claimed in proceedings before a federal grand jury. *See In re Katz,* 623 F.2d 122, 124 n. 1 (2d Cir.1980). The rule instructs that "the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed.R.Evid. 501. Our determination of whether the Office of the Governor may claim a privilege, then, requires us to ascertain "the principles of the common law" and to apply them "in the light of reason and experience." In doing so, while we may draw on the law of privilege as it has developed in state courts, we are not bound by it. In criminal cases, Rule 501 plainly requires that we apply the federal law of privilege. *See United States v. Gillock,* 445 U.S. 360, 368, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980).

Although there is little case law addressing the application of the attorney-client privilege in the specific circumstances presented here, we are nonetheless dealing with a well-established and familiar principle. "The attorney-client privilege is one of the oldest recognized privileges for confidential communications," *Swidler & Berlin v. United States,* 524 U.S. 399, 403, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998); *see also United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir.1989), one that for

centuries has been a part of the common law, in one form or another. While the privilege has a long history, understandings of its purpose and scope have varied over time. *Compare* 1 John W. Strong, *McCormick on Evidence* § 87, at 343–46 (5th ed.1999) (summarizing view that privilege, as it first appeared in Elizabethan England, was linked to barrister's code of honor, but rationale behind it later developed a more utilitarian bent) *with* 24 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5472, at 71–77 (1986) (characterizing as "highly questionable" the view that a rationale predicated on notions of honor, loyalty, and fairness gradually gave way to a utilitarian rationale for privilege, and arguing that during the modern period both rationales have coexisted). *See also United States v. Zolin*, 491 U.S. 554, 562, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989) (noting that "the underlying rationale for the privilege has changed over time"). Today, the generally acknowledged purpose of the privilege is "to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.'" *Swidler*, 524 U.S. at 403, 118 S.Ct. 2081 (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)); *see also In re John Doe, Inc.*, 13 F.3d 633, 635–36 (2d Cir.1994) ("The purpose of the attorney-client privilege is to promote open communication between attorneys and their clients so that fully informed legal advice may be given."); Restatement (Third) of the Law Governing Lawyers § 68 cmt. c (2000) ("The rationale for the [attorney-client] privilege is that confidentiality enhances the value of client-lawyer communications and hence the efficacy of legal services.").

The idea that a robust attorney-client privilege will in fact "promote broader public interests" does not mean that application of the privilege will render justice in every single case. Nevertheless, courts have by reason and experience concluded that a consistent application of the privilege over time is necessary to promote the rule of law by encouraging consultation with lawyers, and ensuring that lawyers, once consulted, are able to render to their clients fully informed legal advice. *See id.* ("Recognition of the privilege reflects a judgment that [impairment of the search for truth in some instances] is outweighed by the social and moral values of confidential consultations.... The law accepts the risks of factual error and injustice in individual cases in deference to the values that the privilege vindicates.").

In light of the common-law roots of the attorney-client privilege and the attendant principle (evident in case law stretching back at least a century, *see Hunt v. Blackburn*, 128 U.S. 464, 470, 9 S.Ct. 125, 32 L.Ed. 488 (1888)) that safeguarding client confidences promotes, rather than undermines, compliance with the law, we believe it best to proceed cautiously when asked to narrow the privilege's protections in a particular category of cases. We are aware, of course, that even existing privileges are not to be "expansively construed," as they "are in derogation of the search for truth," *United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), and that the attorney-client privilege, in particular, "applies only where necessary to achieve its purpose," *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). But this admonishment does not invite a wholesale reassessment of the privilege's utility whenever it is invoked under previously unexplored circumstances. Instead, our application of the privilege in a "new" context remains informed by the longstanding principles

and assumptions that underlie its application in more familiar territory.

There is no dispute in this case that these principles and assumptions apply to government lawyers and their clients under certain circumstances. The Government concedes, for instance, both that a governmental attorney-client privilege exists generally, and that it may be invoked in the civil context. (Gov't Brief at 33); *see also In Re: A Witness Before the Special Grand Jury*, 288 F.3d 289, 291 (7th Cir.2002) ("[B]oth parties here concede that, at least in the civil and regulatory context, the government is entitled to the same attorney-client privilege as any other client."). Ample authority supports both propositions. In 1972, the Supreme Court promulgated Federal Rules of Evidence setting forth nine specific categories of privileges, including an attorney-client privilege. Proposed Federal Rule 503, defining the privilege, included public officers and public entities within its definition of "client," *see* Proposed Fed.R.Evid. 503(a)(1), *reprinted in* 56 F.R.D. 183, 235 (1972); commentary accompanying the proposed rule, moreover, provided that the "definition of 'client' includes governmental bodies," *id.* at 236. While Proposed Rule 503 was not adopted by Congress, courts and commentators have treated it as a source of general guidance regarding federal common law principles. *See, e.g., In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 915 (8th Cir.1997) ("[W]e have described [Proposed Rule 503] as 'a useful starting place' for an examination of the federal common law of attorney-client privilege."); *United States v. Mackey*, 405 F.Supp. 854, 858 (E.D.N.Y.1975) (Weinstein, J.) ("The specific Rules on privilege

promulgated by the Supreme Court are reflective of 'reason and experience.' They are the culmination of three drafts prepared by an Advisory Committee consisting of judges, practicing lawyers and academicians."); 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence,* § 503.02, at 503–10 (2d ed.1997) ("[Proposed Rule 503] restates, rather than modifies, the common-law lawyer-client privilege. Thus, it has considerable utility as a guide to the federal common law."); *see also In re Grand Jury Investigation,* 918 F.2d 374, 380 (3d Cir.1990) ("We believe that the proposed rules provide a useful reference point and offer guidance in defining the existence and scope of evidentiary privileges in the federal courts."). Similarly, section 74 of the Restatement (Third) of the Law Governing Lawyers provides that the "attorney-client privilege extends to a communication of a governmental organization" as it would to a private organization. The commentary to that section notes that "[t]he privilege aids government entities and employees in obtaining legal advice founded on a complete and accurate factual picture." *Id.* cmt. b.[2] While these authorities are not conclusive as to the existence at common law of a governmental attorney-client privilege, they demonstrate that serious legal thinkers, applying "reason and experience," have considered the privilege's protections applicable in the government context.

The case law, as well, while not extensively addressing the issue, generally assumes the existence of a governmental attorney-client privilege in civil suits between government agencies and private litigants. *See, e.g., In re Lindsey,* 158

**2.** The commentary also expresses some hesitation as to the breadth of the governmental privilege, noting, for example, that "[m]ore particularized rules may be necessary where one agency of government claims the privilege in resisting a demand for information by another." *Id.*

F.3d 1263, 1268 (D.C.Cir.1998) ("Courts, commentators, and government lawyers have long recognized a government attorney-client privilege in several contexts."); *Dep't of Econ. Dev. v. Arthur Andersen & Co.*, 139 F.R.D. 295, 300 (S.D.N.Y. 1991); *Detroit Screwmatic Co. v. United States*, 49 F.R.D. 77, 78 (S.D.N.Y.1970); *Galarza v. United States*, 179 F.R.D. 291, 295 (S.D.Cal.1998); *United States v. Anderson*, 34 F.R.D. 518, 522–23 (D.Colo. 1963). The privilege has arisen in a number of these cases in the context of Exemption 5 of the Freedom of Information Act, 5 U.S.C. § 552(b)(5), which allows a federal government agency to withhold from requests under the Act "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." Courts have construed Exemption 5 as covering materials protected by the attorney-client privilege and, in doing so, have assumed that such a privilege attaches when the attorney is a government lawyer and the client a government entity. *See, e.g., Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C.Cir.1980) ("Exemption 5 protects, as a general rule, materials which would be protected under the attorney-client privilege."); *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 252 (D.C.Cir.1977).

There is, then, substantial authority for the view that the rationale supporting the attorney-client privilege applicable to private entities has general relevance to governmental entities as well. The Government argues that while this authority may establish a privilege of some kind, recent case law in other circuits supports its view that the attorney-client privilege in the government context is weaker than in its traditional form. It cites *In Re: A Witness Before the Special Grand Jury*, 288 F.3d 289 (7th Cir.2002) ("*Ryan*"); *In re Lindsey*, 158 F.3d 1263 (D.C.Cir.1998) ("*Lindsey*"); and *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910 (8th Cir.1997) ("*Grand Jury*"), for the proposition that the "governmental" attorney-client privilege must give way where a federal grand jury seeks access to otherwise privileged statements in order to further a criminal investigation. While *Lindsey* and *Grand Jury* involved applications of the privilege to communications by a *federal* executive, and thus involved statutes and considerations unrelated to this case, all three decisions broadly questioned the relevance of the traditional rationale supporting the privilege to the government context. *See Ryan*, 288 F.3d at 293; *Grand Jury*, 112 F.3d at 921; *Lindsey*, 158 F.3d at 1272–73.

■ Drawing on these decisions, the Government contends that the reasons for the traditional attorney-client privilege do not apply with the same force in the circumstances presented by this case: a federal grand jury investigation into potentially criminal government conduct. It argues, first, that George, as a government attorney, has a fundamentally different relationship with her client, the Office of the Governor, than does a private attorney representing a private individual. George's client is a public entity, accountable to the general citizenry. As the Office of the Governor serves the public, the Government argues, so too must George as counsel to that office. Her loyalty to the Governor, the Government contends, must yield to her loyalty to the public, to whom she owes ultimate allegiance when violations of the criminal law are at stake. Accordingly, the Government argues that the privilege should not be used as a shield to permit George, as a government attorney, to withhold client confidences, when revealing them would be in the pub-

lic interest. Implicit in the Government's argument is the presumption that the public interest in the present circumstances lies with disclosure and the furtherance of the "truth-seeking" function of the grand jury. "[T]o allow the Governor's Office to interpose a testimonial privilege 'as a shield against the production of information relevant to a federal criminal investigation,'" the Government concludes, "'would represent a gross misuse of public assets.'" (Gov't Brief at 23 (quoting *Grand Jury,* 112 F.3d at 921)).

We cannot accept the Government's unequivocal assumption as to where the public interest lies. To be sure, it is in the public interest for the grand jury to collect all the relevant evidence it can. However, it is also in the public interest for high state officials to receive and act upon the best possible legal advice. Indeed, the people of Connecticut have deemed the latter interest more important than the former: if *state* prosecutors had sought to compel George to reveal the conversations at issue, there is little doubt that the conversations would be protected. The Connecticut legislature has enacted a statute specifically providing that

> [i]n any civil or criminal case or proceeding or in any legislative or administrative proceeding, all confidential communications shall be privileged and a government attorney shall not disclose any such communications unless an authorized representative of the public agency consents to waive the privilege and allow such disclosure.

Conn. Gen.Stat. § 52–146r(b). The people of Connecticut, then, acting through their representatives, have concluded that the public interest is advanced by upholding a governmental privilege even in the face of a criminal investigation. We do not suggest, of course, that federal courts, charged with formulating federal common law, must necessarily defer to state statutes in determining whether the public welfare weighs in favor of recognizing or dissolving the attorney-client privilege. But we cite the Connecticut statute to point out that the public interest is not nearly as obvious as the Government suggests. One could as easily conclude, with the Connecticut legislature, that the protections afforded by the privilege ultimately promote the public interest, even when they might impede the search for truth in a particular criminal investigation.

We believe that, if anything, the traditional rationale for the privilege applies with special force in the government context. It is crucial that government officials, who are expected to uphold and execute the law and who may face criminal prosecution for failing to do so, be encouraged to seek out and receive fully informed legal advice. Upholding the privilege furthers a culture in which consultation with government lawyers is accepted as a normal, desirable, and even indispensable part of conducting public business. Abrogating the privilege undermines that culture and thereby impairs the public interest. *See* 1 Paul R. Rice, *Attorney–Client Privilege in the United States* § 4:28, at 4 (2d ed. 1999) ("If the government attorney is required to disclose [internal communications with counsel] upon grand jury request, it is sheer fantasy to suggest that it will not make internal governmental investigations more difficult, to the point of being impossible.... To the extent that the protection of the privilege is justified in any corporate context, the need within the government is equal, if not greater.").

We are aware, of course, that the relationship between a government attorney and a government official or employee is not the same as that between a private attorney and his client. For one, in the government context, the individual consult-

ing with his official attorney may not control waiver of the privilege. Even if he does control waiver during his time in government, the possibility remains that a subsequent administration might purport to waive the privilege exercised by a predecessor.[3] Thus, some commentators (and presumably the Government, here) question whether application of the attorney-client privilege in the government context will in fact encourage public officials and employees to confide in counsel. *See, e.g.,* Melanie B. Leslie, *Government Officials as Attorneys and Clients: Why Privilege the Privileged?,* 77 Ind. L.J. 469, 507 (2002). While encouraging little in the way of legal consultation and disclosure, their argument goes, the privilege engenders significant costs by frustrating the "search for truth."

Whatever merit there is to this reasoning, we think it insufficient to jettison a principle as entrenched in our legal tradition as that underlying the attorney-client privilege. Such reasoning amounts to little more than speculation over the way in which the privilege functions in the government context. *Cf. Swidler,* 524 U.S. at 410, 118 S.Ct. 2081 ("A 'no harm in one more exception' rationale could contribute to the general erosion of the privilege, without reference to common-law principles or 'reason and experience.'"). We also reject the idea that because government employees can confer with private counsel to represent their own, individual interests, the privilege is somehow less important when applied to government counsel. The privilege serves to promote the free flow of information to the attorney (and thereby to the client entity) as well as to the individual with whom he communicates. *See Upjohn,* 449 U.S. at 390, 101 S.Ct. 677. The government attorney requires candid, unvarnished information

from those employed by the office he serves so that he may better discharge his duty to that office. *See Grand Jury,* 112 F.3d at 931–32 (Kopf, J., dissenting).

Having determined that the attorney-client privilege applies to the communications at issue in this case, we decline to fashion a balancing test, or otherwise establish a rule whereby a "generalized assertion of privilege must yield to the demonstrated, specific need for evidence . . . ." *Nixon,* 418 U.S. at 713, 94 S.Ct. 3090 (establishing balancing test with regard to executive privilege). The Supreme Court has instructed that, where the attorney-client privilege applies, its protections must be reliably enforced in order to effectuate its goal of promoting compliance with the law. *See Swidler,* 524 U.S. at 409, 118 S.Ct. 2081 ("Balancing *ex post* the importance of the information against client interests, even limited to criminal cases, introduces substantial uncertainty into the privilege's application. For just that reason, we have rejected use of a balancing test in defining the contours of the privilege."); *see also Upjohn,* 449 U.S. at 393, 101 S.Ct. 677 ("An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all."). We see no persuasive reason to abandon that logic here. Of course, nothing we hold today derogates from traditional doctrines, such as the crime-fraud exception, that apply to the private attorney-client relationship and that courts have developed, through reason and experience, to limit egregious abuses of the protections that the privilege affords. *See John Doe, Inc.,* 13 F.3d at 636 ("The crime-fraud exception strips the privilege from attorney-client communications that relate to client communications in further-

---

**3.** We express no view of the effectiveness of such a waiver.

ance of contemplated or ongoing criminal or fraudulent conduct.") (internal quotation marks and citation omitted).

In arguing that we ought not "extend" the attorney-client privilege to the present situation, the Government asks us, in essence, to assign a precise functional value to its protections and then determine whether, and under what circumstances, the costs of these protections become too great to justify. We find the assumptions underlying this approach to be illusory, and the approach itself potentially dangerous. The Government assumes that "the public interest" in disclosure is readily apparent, and that a public official's willingness to consult with counsel will be only "marginally" affected by the abrogation of the privilege in the face of a grand jury subpoena. Because we cannot accept either of these assumptions, we decline to abandon the attorney-client privilege in a context in which its protections arguably are needed most.[4] In the end, we do not view the question before us as whether to "extend" the privilege to the government context, and our decision today does no such thing. Rather, we have simply refused to countenance its abrogation in circumstances to which its venerable and worthy purposes fully pertain.

## CONCLUSION

For the foregoing reasons, we REVERSE the order of the district court.

---

4. Our decision is in conflict with the Seventh Circuit's decision in *Ryan*, and is in sharp tension with the decisions of the Eighth (*Grand Jury*) and the D.C. Circuits (*Lindsey*). We are mindful that uniformity among the circuits fosters predictability in the invocation of the privilege and suppresses forum shopping. *See also Boren v. Sable*, 887 F.2d 1032, 1038 (10th Cir.1989) ("[T]he Federal Rules of

Evidence are intended to have uniform nationwide application ....""); *Matinchek v. John Alden Life Ins. Co.*, 93 F.3d 96, 101 (3d Cir.1996) ("[W]e must attempt, to the extent possible, to harmonize our own federal common law rules with those of other federal courts of appeals."). We are in no position, however, to resolve this tension in the law.