UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles ESTEPA and Francis Vasquez,
Defendants-Appellants.

Nos. 157, 377, Dockets 72–1653, 72–1931.

United States Court of Appeals,
Second Circuit.

·Argued Dec. 1, 1972.

Decided Dec. 29, 1972.

Robert T. Hartmann, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., John W. Nields, Jr., and Walter M. Phillips, Asst. U. S. Attys. of counsel), for appellee.

Harold Baer, Jr., New York City (Guggenheimer & Untermyer, and Peter F. Bonoff, New York City, of counsel), for appellant Estepa.

Lawrence Stern, New York City (Edward S. Panzer, New York City, of counsel), for appellant Vasquez.

Before FRIENDLY, Chief Judge, and WATERMAN and HAYS, Circuit Judges.

FRIENDLY, Chief Judge:

■   Charles Estepa and Francis Vasquez appeal from their conviction, after a bench trial before Judge Brieant in the District Court for the Southern District of New York, on four counts of an indictment charging them, along with Jaime Vasquez, Rafael Perez and Jose Luis Dones, with distributing heroin, possessing it with an intent to distribute, and conspiring to do so, in violation of 21 U.S.C. §§ 812, 841 and 846. Although Estepa challenges the sufficiency of the evidence and Vasquez raises some other points, it is unnecessary to consider these since we hold dismissal of the indictment to be required because of the nature of the presentation to the grand jury.

For purposes of this opinion we can adopt the statement of facts in the Government's brief on Vasquez' appeal: [1]

In the late afternoon of October 14, 1971, Patrolman Jose Guzman of the New York Joint Task Force, acting in an undercover capacity, met with defendant Jaime Vasquez at approximately 5:30 p. m., at 878 Southern Boulevard, Bronx, New York, where they discussed the possibility of Patrolman Guzman purchasing one-eighth of a kilogram of heroin. When Vasquez suggested they see "Joe and Frank," referring to his brother, defendant Francis Vasquez, they proceeded to a house on Longfellow Avenue in the Bronx.

At that location, Patrolman Guzman met Francis Vasquez who told him he could sell him an eighth of heroin for $3100. Shortly thereafter, defendant Dones joined the conversation and was told by the Vasquez brothers that Patrolman Guzman was looking for some cocaine. Dones responded that for $700[0] he could supply him with one-half a kilogram of cocaine. Patrol-

man Guzman was then told to return later that evening.

That evening, Guzman returned to 878 Southern Boulevard where he met Jaime Vasquez and showed him a roll of money which he then placed in the trunk of his automobile. A short time later, Frank Vasquez and Dones arrived in a Volkswagen. Jaime Vasquez had a short conversation with his brother and Dones after which he instructed Guzman to follow the Volkswagen. The two cars proceeded to Longwood Avenue where Dones exited his automobile, came over to Guzman's car and told the undercover patrolman that he would return in ten minutes with the "stuff". While Jaime Vasquez remained with Guzman, Dones returned to his automobile and was driven by Frank Vasquez to 149th Street where he and Vasquez entered a social club. A short time later, Dones and Vasquez left the club accompanied by defendant Charles Estepa, but did not enter the Volkswagen which Vasquez had left double-parked in front of the club, proceeding instead on foot to 150th Street.

Approximately twenty-five minutes later, a blue Ford containing Dones, Frank Vasquez, Estepa (in the front passenger's seat) and driven by an unknown male, returned to Longwood Avenue and parked opposite Patrolman Guzman's automobile. Dones exited the Ford and told Guzman and Jaime Vasquez that he would return in thirty minutes. Approximately one hour later, the same Ford returned with the same passengers, passed Guzman's parked car, hesitating as it did so, and parked around the corner. A few minutes later, Dones arrived alone on foot, entered Guzman's car and handed Guzman a tin foil package inside of which was a plastic bag containing 128.73 grams of heroin hydro-

---

I.  Jaime Vasquez and Perez pleaded guilty before the opening of trial but did not testify. Dones, who pleaded guilty on one count, was called as a witness by

Estepa but claimed his Fifth Amendment privilege. The only witnesses to give testimony at the trial were law enforcement officers.

chloride. Guzman went to the trunk of his car where he had placed the money and dropped his keys as a signal to the surveillance agents. Dones and Jaime Vasquez, who had remained with Guzman during the evening, were then placed under arrest.

A few blocks away, other agents, who had kept the Ford containing Estepa and the unidentified driver under surveillance, received word of the arrest by radio. As the surveillance agents pulled alongside the Ford and identified themselves by showing their badges, the Ford made a quick U-turn and sped off. A high speed chase ensued. At the intersection of Garrison and Whorten Avenues, two packages were thrown out the front window of the Ford on the passenger side where Estepa was sitting. These packages were later retrieved and found to contain a total of 17.27 grams of heroin hydrochloride. The agents then pulled alongside the Ford and again ordered the car to stop after identifying themselves. The Ford, however, sped up, swerved to avoid a truck and at 156th Street made a right turn, a maneuver the agents were unable to negotiate because of the speed of their automobile. The Ford stopped on 156th Street, and both occupants, Estepa and the driver, alighted. The driver escaped on foot and Estepa was placed under arrest. A search of the automobile revealed a packet containing 10.94 grams of heroin hydrochloride on the floor of the passenger side of the front seat where Estepa had been sitting.

Although the Ford in question was officially registered to one Joseph M. Medina, Estepa referred to the car after his arrest as "my car", and was in possession of the automobile's registration.

It is plain from this recitation that, except for the individuals named in

the indictment, the person, and the only person, who was in a position to inform the grand jury of just what occurred up to the point of the arrest of Dones and Jaime Vasquez was Patrolman Guzman. Examination of the trial record shows that the persons (other than the defendants) in the best position to inform the grand jury of what occurred thereafter were Narcotics Agent Finnerty and New York City Policeman Walpole, and, with respect to Estepa's post-arrest statement, New York City Policeman Miller.

None of these men was called. The sole witness before the grand jury was New York City Policeman Twohill, whose observations of the appellants were both limited and remote. When we inquired at argument why Patrolman Guzman was not called to testify before the grand jury, we were told he was in the field doing other work that day; when we asked what reason prevented postponement of the presentation for a day or two, we were told there was none.

Despite Policeman Twohill's extremely limited personal knowledge, he spoke to the grand jury at length and in detail. He began with an incident on September 13, 1971, a month before the substantive crime with which the two appellants were charged.[2] He testified that Perez passed a package, later analyzed by the laboratory of the Bureau of Narcotics and Dangerous Drugs, to Jaime Vasquez who then passed it on to Patrolman Guzman, who paid $150. On this occasion the Assistant United States Attorney interjected "you didn't observe the actual pass, but you did observe the meeting, is that correct?", to which Twohill responded "I did." Twohill then testified that, on September 27, Jaime Vasquez passed a package, later determined to contain heroin, to Patrolman Guzman who paid $120.[3] This time the Assistant did nothing to alert the grand jury to any limitations on Twohill's

---

2. The events of September 13 formed the basis of Count II, against Jaime Vasquez and Perez.

3. This constituted Count III, against Jaime Vasquez.

knowledge. Moving on to the transaction on October 14, 1971, which constituted Counts IV, V and VI against these defendants (and also the principal—in Estepa's case the sole—basis for the conspiracy count), Twohill testified that Guzman requested Jaime Vasquez to furnish a one-eighth kilo of heroin and some cocaine and that Jaime Vasquez told Guzman to drive to Dones' home on Longfellow Avenue. Even if we assume that Twohill had witnessed this meeting from afar, there was nothing in his testimony or in the questions of the Assistant to inform the grand jury that he had not and could not have heard any such request or answer. He recounted to the grand jury what took place at Dones' house and a conversation between Frank Vasquez and Guzman in connection with the sale of a one-eighth kilo of heroin for $3100, a conversation between Dones and Guzman for the sale of a half kilo of cocaine for $7,000, and an instruction by Frank Vasquez to Guzman to meet near Jaime Vasquez' home. Here again, even if we assume, perhaps overgenerously so far as the record goes,[4] that Twohill saw something, he clearly heard nothing, but the grand jurors were not told this. There followed testimony about Guzman's having driven Jaime Vasquez back to his home, returning there, and showing him a roll of money, which Twohill might well have observed. He next described the meeting of the Vasquez brothers, Dones and Guzman. Here he failed to follow the script and said that Guzman, rather than Jaime Vasquez, directed that they follow Dones' car. The error was natural since, as we are aware but the grand jury was not, he had no personal knowledge whatever. Twohill then testified that Vasquez and Guzman, followed by Dones and his passengers, proceeded

to a location on Longwood Avenue in the Bronx where Vasquez spoke with the individuals in Dones' car. Next came testimony of the arrival at and departure from the social club, which Twohill had in fact observed. He then proceeded to testify to the arrival of Dones, Frank Vasquez and Estepa in the blue Ford and to Guzman's being told to wait for half an hour for the defendants' return with the narcotics; nothing informed the grand jury that Twohill had not heard anything of the sort. Finally, and most egregiously, after relating the return of the blue Ford, the signal and the arrest, he described the chase, the throwing of the packets out of the Ford, the arrest of Estepa,[5] and the discovery of a package under the front seat of the Ford, which he had not observed at all since, as he testified at trial, he had remained at the scene of the arrest.

■■ We have previously condemned the casual attitude with respect to the presentation of evidence to a grand jury manifested by the decision of the Assistant United States Attorney to rely on testimony of the law enforcement officer who knew least, rather than subject the other officers, or himself, to some minor inconvenience, see United States v. Arcuri, 405 F.2d 691, 692 (2 Cir. 1968), cert. denied, 395 U.S. 913, 89 S.Ct. 1760, 23 L.Ed.2d 227 (1969) even if the motivation was merely this rather than the more sinister reason suggested in United States v. Borelli, 336 F.2d 376, 391–392 (2 Cir. 1964), cert. denied sub nom. Mogavero v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965), in the writer's dissent in United States v. Payton, 363 F.2d 996, 1000 & n. 1 (2 Cir.), cert. denied, 385 U.S. 993, 87 S.Ct. 606, 17 L.Ed.2d 453 (1966), and in Judge Medina's dissent in United States v. Beltram, 388 F.2d 449, 451–

---

4. On cross-examination at trial, Twohill admitted that he did not "recall" being at the Longfellow Avenue location on October 14.

5. Twohill had told the grand jury that Frank Vasquez was in the Ford on its return, although he admitted at trial that

this was erroneous. He also testified—contrary to the explicit testimony at trial of officers involved in the chase—that two men escaped rather than only the unknown driver; Frank Vasquez suggests the grand jury could well have been misled into believing he was the other man.

452 (2 Cir.), cert. denied sub nom. Malofsky v. United States, 390 U.S. 1017, 88 S.Ct. 1273, 20 L.Ed.2d 168 (1968). When the framers of the Bill of Rights directed in the Fifth Amendment that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury," they were not engaging in a mere verbal exercise. The importance of avoiding undue reliance upon hearsay before a grand jury is heightened by this circuit's view that an indictment constitutes a finding of probable cause and avoids the need for a preliminary hearing under F.R.Cr.P. 5 (c). Sciortino v. Zampano, 385 F.2d 132 (2 Cir. 1967), cert. denied, 390 U.S. 906, 88 S.Ct. 820, 19 L.Ed.2d 872 (1968). We have not gone so far as to apply to grand juries the proposal in the American Law Institute's Model Code of Pre-Arraignment Procedure §§ 330.4(4) and 340.5 (Tent.Draft No. 5, 1972), that hearsay may be received at a preliminary hearing or by a grand jury only "if the court determines that it would impose an unreasonable burden on one of the parties or on a witness to require that the primary source of the evidence be produced at the hearing, and if the witness furnishes information bearing on the informant's reliability and, as far as possible, the means by which the information was obtained," see also ABA Standards Relating to the Prosecution Function and the Defense Function § 3.6 (Approved Draft 1971), although, for reasons elucidated in the dissenting opinion in United States v. Payton, *supra*, 363 F.2d at 1000, we do not believe Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), would prevent this exercise of our supervisory powers should we deem it wise. But we

have insisted that, even though "[t]here is no affirmative duty to tell the grand jury *in haec verba* that it is listening to hearsay," United States v. Malofsky, 388 F.2d 288, 289 (2 Cir.), cert. denied, 390 U.S. 1017, 88 S.Ct. 1273, 20 L.Ed.2d 168 (1968), the grand jury must not be "misled into thinking it is getting eye-witness testimony from the agent whereas it is actually being given an account whose hearsay nature is concealed . . . ." United States v. Leibowitz, 420 F.2d 39, 42 (2 Cir. 1969). That was what happened here.

The Government argues that the prosecutor discharged his obligation to enlighten the grand jury by bringing out that Twohill did not see "the actual pass" from Perez to Jaime Vasquez to Guzman on September 13, 1971, and by two other statements noted in the margin.[6] But grand jurors cannot be supposed to possess sufficient astuteness to infer that, because Twohill on one occasion made clear the limited degree of his knowledge of a transaction occurring more than a month before the events of October 14, this carried through to all; indeed, the contrary inference would be quite as reasonable. The Government contends more broadly that, since Twohill never stated he was acting in an undercover capacity, the grand jurors should have known he was only a surveilling agent who could not have seen or heard the details of the occurrences and conversations to which he testified with such specificity. Grand jurors do not have this degree of familiarity with law enforcement techniques, and it would have been so easy for the Assistant United States Attorney to tell them what they are now claimed to have known. Moreover, this explanation does not at all explain Twohill's

6. One was a question asking "did Patrolman Guzman see the defendants, Vasquez, Frank Vasquez, Jose Dones and Charles Estepa in a 1971 Ford?", to which Twohill answered, "He did." We fail to see how this carried over to other questions which the grand jurors would have understood as assuming that Twohill was testifying from direct knowledge. Indeed,

the very next questions, including one with respect to conversations, were framed on the basis that Twohill was speaking in that capacity. The other was an instance where Twohill testified that others of his office had determined that Estepa had purchased the Ford; this proves nothing.

testimony about the chase, the throwing of the packets, and Estepa's arrest. This was something a surveilling agent could well have observed, yet the fact, presumably known to the Assistant, was that Twohill had not witnessed it at all.

The many opinions in which we have affirmed convictions despite the Government's needless reliance on hearsay before the grand jury show how loathe we have been to open up a new road for attacking convictions on grounds unrelated to the merits. We have been willing to allow ample, many doubtless think too ample, latitude in the needless use of hearsay, subject to only two provisos—that the prosecutor does not deceive grand jurors as to "the shoddy merchandise they are getting so they can seek something better if they wish," United States v. Payton, *supra*, 363 F.2d at 1000 (dissenting opinion), or that the case does not involve "a high probability that with eyewitness rather than hearsay testimony the grand jury would not have indicted." United States v. Leibowitz, *supra*, 420 F.2d at 42; United States v. Arcuri, 282 F.Supp. 347, 350 (E.D.N.Y.), aff'd, 405 F.2d 691 (2 Cir. 1968). We had hoped that, with the clear warnings we have given to prosecutors, going back to United States v. Umans, 368 F.2d 725, 730 (2 Cir. 1966), cert. granted, 386 U.S. 940, 87 S.Ct. 975, 17 L.Ed.2d 872 cert. dismissed as improvidently granted, 389 U.S. 80, 88 S.Ct. 253, 19 L.Ed.2d 255 (1967), and the assurances given by United States Attorneys, see United States v. Arcuri, *supra*, 405 F.2d at 693 & n. 4, a reversal for improper use of hearsay before the grand jury would not be required. Here the Assistant United States Attorney, whether wittingly or unwittingly—we prefer to think the latter, clearly violated the first of these provisos. We cannot, with proper respect for the discharge of our duties, content ourselves

with yet another admonition; a reversal with instructions to dismiss the indictment may help to translate the assurances of the United States Attorneys into consistent performance by their assistants. As Judge Medina said in his dissent in United States v. Beltram, *supra*, 388 F.2d at 453, "This would not let appellants go scot free, as there would be time to reindict them and have their guilt or innocence passed upon again on a record not tainted with irregularity." See United States v. Ball, 163 U.S. 662, 671–672, 16 S.Ct. 1192, 41 L.Ed. 300 (1896).[7]

The judgments of conviction are reversed, with instructions to dismiss the indictment.

---

7. This applies not only to Francis Vasquez but also to Estepa, whose counsel joined Vasquez' grand jury objections at the trial, despite Estepa's claim of insufficiency of the evidence. See Bryan v. United States, 338 U.S. 552, 560, 70 S.Ct. 317, 94 L.Ed. 335 (1950); Forman v. United States, 361 U.S. 416, 425–426, 80 S.Ct. 481, 4 L.Ed.2d 412 (1960).