**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ralph JACOBSON, Defendant-Appellant.**

**No. 1350, Docket 82–1083.**

United States Court of Appeals,
Second Circuit.

Argued July 15, 1982.
Decided Oct. 12, 1982.

Gerald Shargel, New York City (Judd Burstein, New York City, of counsel) for defendant-appellant.

Charles E. Rose, Asst. U. S. Atty., E. D. New York, Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., E. D. N. Y., Jane Simkin Smith, Asst. U. S. Atty., Brooklyn, of counsel) for plaintiff-appellee.

Before CARDAMONE and WINTER, Circuit Judges, and MALETZ, Judge.*

PER CURIAM:

Defendant-appellant Ralph Jacobson appeals from a judgment of conviction of the United States District Court for the Eastern District of New York (Mishler, *Judge*) entered on March 12, 1982 after a four-day jury trial. Jacobson was convicted of one count of acquiring or maintaining an interest in or control of an enterprise engaged in interstate commerce through the collection of an unlawful debt in violation of 18 U.S.C. § 1962(b) (1976) (Racketeer Influenced and Corrupt Organizations Act or "RICO"). He was acquitted of one count of collecting and attempting to collect an extension of credit through the use of extortionate means in violation of 18 U.S.C. § 894(a)(1) (1976). Judge Mishler sentenced Jacobson to five years imprisonment, of which the last 54 months were suspended and to be served on probation. On appeal, Jacobson presents three issues for review by this Court: (i) whether the evidence presented at trial was sufficient to sustain his conviction under 18 U.S.C. § 1962(b); (ii) whether the manner in which testimony was presented to the indicting grand jury was proper; and (iii) whether the District Court's denial of his motion to disclose transcripts of the indicting grand jury was error. Although we find the evidence was more than sufficient to sustain Jacobson's conviction, oral argument before this Court disclosed serious inaccuracies in the government's brief as to what occurred before the indicting grand jury. We therefore remand with instructions to order disclosure of all relevant grand jury transcripts and to hold a hearing on the validity of the indictment.

I

In 1967, Gary Chartoff, his father Abraham, and his younger brother, Howard, opened the "Triple C" bagel bakery in a shopping center in Plainview, New York. The bakery premises were leased for a 15-year term from Morton Realty. In 1969, the Triple C encountered financial difficulties. Abraham Chartoff left the business after a disagreement with his son Gary and Gary, who had a long history of gambling trouble and money mismanagement, was unable to obtain bank financing to shore up the bakery's affairs. Faced with these reverses, Chartoff testified that he "went to a friend of mine and I asked him if [he] knew of any loansharks where I could borrow money." This friend, a local delicatessen owner named Philip Fox, introduced Chartoff to appellant Jacobson in November, 1969.

The initial agreement between Chartoff and Jacobson involved an advance of $2,500 by Jacobson which Chartoff agreed to repay in 10 weekly installments of $300, for a total of $3,000. For the next 10 weeks, someone named "Burt" came by Chartoff's bakery and collected $300. Upon repayment of the first loan, Jacobson advanced Chartoff $2,500 in January, 1970, and an-

---

* The Honorable Herbert N. Maletz, Judge, United States Court of International Trade, sitting by designation.

other $2,500 in March, 1970, on identical terms. Despite these loans, the Triple C continued to founder. Howard Chartoff also left the business after a dispute with Gary, and the bakery's debts, including one to the Internal Revenue Service, continued to mount.

In June, Chartoff approached Jacobson and asked for a $15,000 loan. According to Jacobson, the resulting transaction involved an agreement on his part to invest $15,000 in the Triple C. In return, Chartoff agreed to assign Triple C's lease to him as security. The government, however, characterized the deal as a $15,000 loan for which Jacobson required as security a second mortgage on Chartoff's home and assignment of the lease. In any event, Chartoff agreed to pay Jacobson $150 per week for the remaining 13-year term of the lease. Shortly afterward, the payment was raised to $175, an arrangement which continued until 1973.

In 1973, Chartoff and his brother-in-law, Robert Krupin, decided to open a second bagel bakery in another shopping mall. They entered an agreement with Jacobson on essentially the same terms as the June, 1970, deal. However, the second bakery failed within a year, and Chartoff then agreed to pay Jacobson $225 per week from the receipts of the Triple C in order to cover both loans. From 1974 to 1975, Chartoff made these payments. Then, in the winter of 1975, "as a last ditch survival chance," Chartoff borrowed an additional $10,000 from Jacobson and agreed to pay the money back in 13 weekly installments of $1,000. After several weeks, Chartoff stopped paying Jacobson on any of the loans. In June, 1976, Chartoff began cooperating with the F. B. I.

Jacobson, as assignee of the Triple C lease, brought a state court action leading to Chartoff's eviction. Two weeks later, on July 30, the Internal Revenue Service conducted an auction sale of Triple C's fixtures to recoup back taxes and Jacobson's wife, Joan, purchased the fixtures. Jacobson then transferred the lease to his wife. In 1977, the fixtures, equipment, and lease were all sold to another bagel bakery.

On appeal, Jacobson presents a novel but not difficult issue. 18 U.S.C. § 1962(b) provides in pertinent part:

It shall be unlawful for any person . . . through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

Jacobson contends that, in becoming Triple C's landlord, he did not acquire an "interest" in the enterprise. He argues that the RICO statute distinguishes between "property rights" and "interests" and that Section 1962(b) covers only the latter. Since a lease is clearly a property right, Jacobson asserts that his conduct falls outside the ambit of the statute.

We reject his contention. By its terms, the statute permits conviction upon a showing that the defendant acquired *either* an "interest in" *or* "control of" an enterprise through an unlawful debt. Following the standard of *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), all permissible factual inferences must be resolved in the government's favor. The jury here might easily have inferred that Jacobson used the lease as a means to control the bakery enterprise and concluded that, when Jacobson evicted Chartoff and purchased the fixtures and equipment through his wife, he acquired control of the bakery. Indeed, there was testimony that even prior to the formal eviction, Jacobson changed the bakery's locks and took money directly from the store's cash register to cover the debts owed him, actions a jury might reasonably believe constituted the exercise of control.

We also reject Jacobson's contention that Section 1962(b) excludes "property rights" such as leaseholds from the term "interests." As the "old" Fifth Circuit has recently stated:

We must assume 'that the legislative purpose is expressed by the ordinary meaning of the words used.' *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585 [590],

7 L.Ed.2d 492 (1962). The common or dictionary definition of the term includes 'right, title or legal share in something; participation in advantage, profit and responsibility.' Webster's Third New International Dictionary 1178 (1971). It has also been defined as '[t]he most general term that can be employed to denote a right, claim, title, or legal share in something.' Black's Law Dictionary 729 (5th ed. 1979).... Indeed, this understanding comports with the House Report's definition of 'interest' as inclusive of 'all property and interests, as broadly described, which are related to the violations.' H.R.Rep.No. 1549, 91st Cong., 2d Sess. 57, *reprinted in* [1970] U.S.Code Cong. & Ad.News 4007.

*United States v. Martino,* 681 F.2d 952 at 954, 955–56 (Former 5th Cir. 1982) (en banc).

So defined, "interest" in fact encompasses all "property rights" in a business enterprise. Chartoff's assignment of the lease gave Jacobson a right or claim to the bakery premises which he clearly asserted. He therefore acquired an interest in Triple C in connection with the collection of a wrongful debt.

We do not agree with appellant that because the RICO forfeiture provision uses the term "interest" as well as "property ... right," 18 U.S.C. 1963(a)(2),[1] these terms are mutually exclusive. That this use of language reflects nothing more than a Congressional intent to insure a broad reach of that sanction is demonstrated by the inclusion within the forfeiture provision

of "property" and "contractual right[s]" even if those rights were obtained independently of acts violating Section 1962.

■ Accordingly, we hold that the evidence was sufficient to sustain Jacobson's conviction.

## II

Jacobson also claims that evidence was improperly presented to the grand jury which indicted him in that the evidence consisted exclusively of transcripts from a prior grand jury read by the prosecutor without cautionary instructions. He also argues that it was error for the District Court to deny his motion for production of the grand jury transcripts.

The factual background of the grand jury issue has caused some confusion. Two grand juries investigated the activities of Jacobson which are the subject of the indictment. The first met in 1976 and did not indict. The second, which met in 1981, handed down the present indictment two days before the statute of limitations was to run. Before the District Court, it was the understanding of appellant's counsel, based on his perception of representations by the prosecutor, that the evidence presented to the 1981 grand jury consisted solely of selected transcripts from the 1976 grand jury. The nature of these representations, if any, is unclear, but appellant's counsel left little doubt about his understanding, and the prosecutor did not fully clarify a somewhat confused situation in District Court.[2] Judge Mishler reviewed

---

**1.** 18 U.S.C. § 1963(a)(2) (1976) reads:

Whoever violates any provision of section 1962 of this chapter shall be fined not more than $25,000 or imprisoned not more than twenty years, or both, and shall forfeit to the United States ... (2) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which he has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962.

**2.** For example, after the defense attorney, Gerald Alch, stated that his understanding was

that the proceedings in 1981 consisted merely of reading transcripts, of certain witnesses who testified in 1976 albeit not all of those witnesses,

Transcript of Proceedings of December 2, 1981 at 6, and continued to speak at length regarding the use of five year old testimony, *e.g., id.* at 8, the prosecutor stated,

Your honor, all the transcripts that were read to the Grand Jury—well, the two transcripts that were read have been turned over as 3500 material, except for the testimony of Agent Abbott, who will not be testifying[,]

*id.* at 10, without expressly correcting the defense attorney's misunderstanding. On the other hand, the prosecutor did state at trial,

the transcripts of the 1981 grand jury and held that the evidence was properly presented. The prosecution made all the transcripts of testimony before the 1976 grand jury available to appellant but withheld the 1981 transcripts. Judge Mishler denied appellant's motion for the production of the latter transcripts. Appellant requested they be preserved for appeal.

Appellant's brief to this Court was clearly based on the assumption that the evidence before the 1981 grand jury consisted solely of certain of the 1976 transcripts.[3] The government's brief did nothing to dispel this assumption. Instead, it stated:

> For reasons not explained in the record, the case remained dormant until July 10, 1981, when the case was re-presented to another grand jury. At that time, the Assistant United States Attorney called no live witnesses, but read back the 1976 testimony of a number, but not all, of the witnesses.

Brief for the United States at 8. Three pages later, it stated:

> Thus, defense counsel's motion to inspect the 1981 grand jury minutes, which consisted only of the comments of the Assistant United States Attorney, and the readback of the testimony of certain

> Your honor, the person who testified were— well I take it back. The transcripts that were read were the deposition of Special Agent Abbott. That we would not turn over. It's not 3500 material. Agent Abbott was just the case agent and he was laying out the entire foundation, as your Honor knows. Then there was Mr. Philip Fox. That has been turned over. And Mr. Howard Chartoff. That has been turned over.
> *Id.* at 36.

**3.** Appellant's brief states the following:
[t]he presentation of the case to the grand jury was also strikingly irregular. In 1976, after Gary Chartoff had commenced cooperating with the government, the charges at issue in this case were presented to a grand jury, which did not return an indictment. (A 46–53) Thereafter, on July 11, 1981—just two days before the statute of limitations would run out—the government presented the case again to a new grand jury. However, unlike the 1976 presentation, there was no live testimony. Rather, transcripts of testimony presented in 1976 were simply read to the grand jury.
Brief for Jacobson at 13.

witnesses presented in 1976, was denied. However, defense counsel was supplied with the testimony of *every* witness who testified in 1976, regardless of whether it was read to the 1981 grand jury.

*Id.* at 11.

The following heading introduced Point Three of the government's argument:

> SELECTIVE USE OF THE 1976 GRAND JURY TRANSCRIPTS WAS A PROPER EXERCISE OF PROSECUTORIAL DISCRETION

*Id.* at 21. This was directly followed by the statement that:

> The government conceded below that the Assistant United States Attorney did not read the testimony of all the witnesses who testified in 1976 to the 1981 grand jury.

*Id.* One page earlier, it asserted,

> since the Assistant United States Attorney presented the case by reading the 1976 transcripts without calling one live witness, there can be no question that the grand jury was aware that the evidence being presented was hearsay.

*Id.* at 20.

Based on these representations, the government's brief then argued:

> . . . the government advised defendant that, in fact, not all of the 1976 testimony had been presented to the 1981 grand jury. (A 32–33) Of particular importance was the fact that not all of Gary Chartoff's testimony had been presented.
> *Id.* at 15.
> In the present case, the selective presentation of the 1976 grand jury evidence to the 1981 grand jury dooms the prosecution of defendant. That the government chose to rely on the transcripts of the 1976 testimony is very disturbing in itself. This was a case that came down to the credibility of Gary Chartoff, a man described by the trial court as "about the most unsympathetic victim I've come across in my 20 years." (Sentencing minutes at 41) The grand jury should have had an opportunity to see this witness in person, to view his demeanor and to make an independent and informed assessment of whether he should be believed. At the least, given the importance of Chartoff, all of Chartoff's testimony should have been presented.
> *Id.* at 19.

Here, prior to trial, Jacobson was provided with the transcripts of all the witnesses who testified in 1976. Curiously, although he claims that by not reading all the 1976 transcripts, the 1981 grand jury was misled, he cites *not one example* from any of the transcripts, all of which are and were available to him, of where or how the grand jury was misled, or how not reading a particular transcript was an unfair tactic by the prosecutor.

*Id.* at 22.

These statements were understood by us to mean what they plainly say: the sole evidence before the 1981 grand jury consisted of selected transcripts from the 1976 grand jury, all of which were available to appellant. At oral argument, however, a considerably different set of facts relating to the 1981 grand jury emerged. In response to direct questions, the prosecutor stated that the principal testimony before the 1981 grand jury was the 1981 deposition of an FBI agent named Abbott describing facts told him by Gary Chartoff. Chartoff was the principal government witness at trial and had also testified before the 1976 grand jury. Because the agent was ill at the time the grand jury was deliberating, the government used his deposition rather than his live testimony.

During oral argument, the following colloquy was recorded:

> Judge: The question was all of Chartoff's testimony read to the grand jury.
>
> Mr. Rose: None of Chartoff's testimony was read. None of it sir. It was made available, the case was put in through the case agent with the proviso that Mr. Chartoff was, with all due respect in the witness protection program, he could be called as a witness.
>
> \*   \*   \*   \*   \*   \*
>
> Judge: Was the grand jury advised that it could have been desired to have these witnesses called for it?
>
> Mr. Rose: Yes sir.

We were also advised at oral argument that while Mr. Chartoff was in the witness protection program at the time of the 1981

grand jury, "it was possible of course to bring him in."

We have now reviewed the minutes of both grand juries. The agent's testimony consists largely of the answer "yes" to extremely long and detailed questions posed by the prosecutor as to what Chartoff had told Abbott. While the prosecutor did caution the grand jury about the hearsay nature of the testimony before it—although not about double hearsay or the almost exclusive use of leading questions—he did not offer to produce the transcripts of Gary Chartoff's 1976 testimony or even disclose their existence. Moreover, contrary to the apparent representations made at oral argument, he told the grand jury that Chartoff was unavailable because he was in the Federal Witness Protection Program and that the prosecutor neither knew nor was permitted to know Chartoff's whereabouts. The prosecutor also informed the grand jury that the statute of limitations would run in three days.

██ There are thus serious inconsistencies between the government's brief and the actual record before the grand jury. While these were corrected in response to questions at oral argument, other representations made to us as to what was said to the grand jury about the availability of Gary Chartoff appear to be incorrect. The inaccuracies in the government's brief and argument are serious matters. *See* New York State Bar Association Code of Professional Responsibility, DR 7–102(A)(5), *reprinted in* N.Y. Jud. Law, Appendix at 487 (McKinney 1975). They are particularly serious in this case since appellant's counsel did not have access to the 1981 transcripts and obviously believed, as did we until oral argument, that some or all of Gary Chartoff's 1976 testimony was read to the 1981 grand jury. This misapprehension was corrected at oral argument. However, further incorrect statements were made there about what was said to the grand jury concerning Gary Chartoff's unavailability. We will on this occasion attribute these latter statements to carelessness, particularly since our intention of reading the 1981 testimony had

been made clear at that time. However, we expect those government counsel involved to take heed of the seriousness with which we view inaccurate representations of fact, and those who supervise them to take affirmative steps to prevent a recurrence.

We turn now to appellant's claim that the indictment is invalid under our decision in *United States v. Estepa,* 471 F.2d 1132 (2d Cir. 1972). We believe that adversary argument upon a full record is the proper method of resolving this issue. Appellant's counsel has not reviewed the grand jury transcripts and thus has not had an opportunity to argue from an accurate factual base. The government also has not had that opportunity, although as to it, the causes are entirely of its own making. Moreover, there are lacunae in the record. Portions of agent Abbott's testimony before a 1977 grand jury were also read to the 1981 jury but this transcript has not been turned over to us. In addition, the prosecutor represented at one point in the District Court that prior testimony of Howard Chartoff [4] was read to the 1981 grand jury. We find no such testimony in either the 1976 or 1981 transcripts. Finally, since the principal issue is whether the 1981 presentation significantly misled the grand jury either as to the quality of the evidence before it or as to its ability to obtain firsthand evidence from those witnesses directly involved, *id.,* important factual issues surround the availability of Gary Chartoff at the time of the 1981 grand jury. While the prosecutor told the grand jurors that Chartoff was unavailable, he stated in oral argument before us that "[i]t was possible of course to bring him in." The issue can be resolved only by the testimony of the government officials involved taken under oath subject to cross-examination. When these factual issues are resolved, the legal issues will be considerably sharpened. We remand, therefore, for a hearing as to whether the indictment is valid and order that all relevant transcripts of all grand juries be given to appellant.

4.  *See* note 2 *supra.*

The case is affirmed subject to a determination on remand that the indictment is valid. If the District Court on remand, or this Court on appeal after remand, should decide that the indictment is invalid, the indictment must be dismissed and the conviction reversed. This panel will, if practicable, hear any appeal from the remand.