**UNITED STATES of America, Appellee,**

v.

**Angelo RUGGIERO, Gene Gotti, John Carneglia, Michael Coiro, Joseph Guagliano, Anthony Moscatiello, Oscar Ansourian, Gerlando Sciascia, Edward Lino, Mark Reiter, William Robert Cestaro, Salvatore Greco, Joseph Lo Presti, Vincent Lore, Anthony Gurino, and Caesar Gurino, Defendants,**

**Anthony Gurino and Caesar Gurino, Defendants–Appellants.**

**Nos. 633, 634, Dockets 90–1382, 90–1434.**

United States Court of Appeals, Second Circuit.

Argued Feb. 14, 1991.

Decided May 30, 1991.

Susan C. Wolfe, New York City (Mark A. Summers, John L. Pollok, Hoffman & Pol-

lok, New York City, of counsel), for defendants-appellants.

Leopold Laufer, Asst. U.S. Atty. Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty. for the Eastern District of New York, Matthew E. Fishbein, David C. James, Michael G. Considine, Asst. U.S. Attys., Brooklyn, N.Y., of counsel), for appellee.

Before PIERCE, WINTER and WALKER, Circuit Judges.

WINTER, Circuit Judge:

Two brothers, Anthony and Caesar Gurino, appeal from their convictions for conspiring and endeavoring to obstruct a grand jury investigation into the former whereabouts and accumulated assets of Salvatore Ruggiero, a deceased narcotics fugitive. They raise a host of objections spanning from the evidence before the grand jury to the petit jury instructions, all of which we reject.

## BACKGROUND

### A. *The Properties*

On May 6, 1982, Salvatore Ruggiero and his wife, Stephanie, were killed when their private jet crashed in the Atlantic Ocean near Savannah, Georgia. Salvatore had been a fugitive since the mid–1970's, having been charged in three federal indictments with extortion, tax evasion, and trafficking in heroin. When Salvatore went into hiding, several of his associates, including appellants, began to assist Salvatore in concealing his whereabouts by assuming legal ownership of certain of his real estate investments. Three properties are the subject of this action.

### 1. *The Pennsylvania Property*

Hoping to buy a vacation home near the Pocono mountains in Pennsylvania, Salvatore contacted a Pennsylvania realtor, John Cowley, in November 1981. Cowley located suitable property and Salvatore negotiated the terms with the seller—a $100,000 contract price supplemented by an under-the-table cash payment of $60,000. To conceal his identity, Salvatore executed the purchase through LVC Corporation, Inc. ("LVC"), incorporated in the name of Caesar Gurino. Caesar signed the Commonwealth of Pennsylvania Articles of Incorporation and Registry Statement for LVC, as well as the contract of sale for the home. Other documents, including the signature card and corporate resolution necessary to open a bank account in the name of LVC and five checks drawn on that account used to complete the closing, were signed by Salvatore in Caesar's name.

Salvatore arranged for Cowley to manage the property, handle the mail, and pay all bills, for which Salvatore reimbursed him in cash. Cowley kept the bills and other mail addressed to LVC in a special file that also contained LVC's cancelled checks and bank statements. The Articles of Incorporation and Registry Statement were held by Cowley's brother, attorney Michael Cowley, who had prepared them in connection with the incorporation of LVC. In late 1983, after Salvatore's death, Caesar retrieved the LVC documents held by Michael Cowley and sold the house, depositing the proceeds in LVC's bank account. Shortly afterward, Caesar wrote LVC checks that transferred most of the funds to a company controlled by his associate Anthony Moscatiello.

### 2. *The New Jersey Property*

In 1981, Salvatore's primary residence was a house on Tortoise Lane in Franklin Lakes, New Jersey, leased in the name of an associate. In the fall of that year, Salvatore arranged to buy a newly built home on Shadow Ridge Road in Franklin Lakes, this time using Lou–Roe Stables ("Lou–Roe"), a horse racing and stable business operated by Anthony and Caesar Gurino, as the purchasing vehicle. In October 1981, Salvatore signed the sales contract on behalf of Lou–Roe and, as a downpayment, tendered to the realtor a $25,000 check drawn on Lou–Roe's bank account and signed by Caesar Gurino.

A short time later, Salvatore changed his mind and tried to rescind the purchase. On November 5, 1981, attorney Richard Lipsman wrote to the realtor on behalf of Lou–

Roe and demanded return of the $25,000 deposit. On November 6, the builder of the home wrote to the realtor stating that it was entitled to the $25,000. The realtor forwarded both letters to Salvatore's Tortoise Lane address and the builder forwarded a carbon copy of its demand letter to Lou–Roe. In addition, in March 1982, the realtor sent two letters to Lipsman, one acknowledging his demand and the other informing him that the $25,000 would be placed in escrow until the dispute was resolved. The matter of the $25,000 eventually was litigated, and in June 1982, after Salvatore's death, Lipsman continued to negotiate with the builder for return of the downpayment.

### 3. The Queens Property

In 1975, Import Construction Company ("Import"), of which Anthony Gurino was president, held title to two adjoining parcels of land in Queens, New York on behalf of Salvatore Ruggiero. Late that year, at Salvatore's behest, Anthony mortgaged these parcels for a $130,000 loan from Cross County Savings and Loan. In 1981, Salvatore, now in hiding, bought this mortgage via Vimi Steamship Company, Ltd. ("Vimi"), a Liberian corporation that he controlled. In the meantime, however, the City of New York had seized one of the parcels in an *in rem* action resulting from nonpayment of property taxes. Beginning in November 1981 and continuing through February 1983, Anthony, on behalf of Import, pursued a legal action, ultimately successful, to recover title to the property. Then, in May 1984, Import transferred title to both parcels to Vimi, which in turn sold the property. Again, some of the revenue went to accounts controlled by Moscatiello, but the bulk was seized in 1985 by the United States as the proceeds of narcotics offenses.

### B. The Government Investigation

The government learned of the efforts to conceal Salvatore Ruggiero's ownership of real estate while investigating possible narcotics violations by his brother, Angelo Ruggiero, and others. Commenced in November 1981, that investigation included electronic surveillance in the form of a "bug" placed in Angelo's home during April, May and June 1982. Participants in the taped conversations included Angelo Ruggiero, Caesar Gurino, Anthony Gurino, and various others. These conversations revealed that in the aftermath of Salvatore's death, his former associates set out to avoid being indicted for having harbored Salvatore as a fugitive and to locate and liquidate Salvatore's assets.

On May 11, FBI Special Agent Edward Woods called on Salvatore's sister-in-law, Estelle Mitchell. Mitchell refused to talk and handed Woods the business card of attorney Michael Coiro. Woods informed her that he would return soon with a grand jury subpoena. Later that day, investigators recorded Angelo discussing Woods's visit to Mitchell with associate Gene Gotti.

On May 16, Angelo dispatched the Gurino brothers to Pennsylvania to retrieve the LVC file from John Cowley and to remove Salvatore's papers from the vacation home. That evening investigators recorded a conversation among Angelo, the Gurinos, and Coiro wherein the four reviewed some of the items retrieved from Pennsylvania, including a check disbursement schedule and an electric bill, and concocted a story to explain the source of the funds used to buy the home.

On May 21, Woods went to Arc Heating and Plumbing ("Arc Heating") in Ozone Park, New York, another business of the Gurinos, and served a grand jury subpoena on Caesar, as custodian of records for Lou–Roe, which had the same business address as Arc Heating. That subpoena ordered Caesar to produce:

(a) all ledgers, cash receipts and disbursements books, checks, checkbooks, deposit slips and bank account statements for the period January 1, 1977 through the present date;

(b) an original check dated on or about 10/17/81 in the amount of $25,000 and all documents pertaining thereto;

(c) any and all checks issued at the request or direction of or on behalf of Salvatore and/or Stephanie Ruggiero

and all records regarding any funds or monies received from said persons.

During a brief encounter with Anthony at Arc Heating, Woods observed three boxes containing "loosely thrown" papers, but did not determine their exact contents.

On May 23, investigators recorded another conversation at Angelo Ruggiero's home. In it, Angelo questioned Anthony Gurino closely about the Lou–Roe subpoena. Anthony said that Woods had alarmed him when he walked into the office at Arc Heating because boxes relating to Salvatore were in plain view. He also expressed concern about a possible harboring charge, because as an operator of Lou–Roe he was the "direct link" between Salvatore and the New Jersey property.

On May 27, Caesar testified before the grand jury and produced banking records of Lou–Roe. He did not, however, surrender any copies of correspondence relating to the New Jersey property. Also on that day, the government served a second subpoena on Caesar this time as custodian of records for LVC. It ordered him to produce "all records of LVC Corporation including but not limited to bank account statements, checks, financial records, correspondence, ledgers, federal tax returns and deposit slips."

On June 10, Caesar produced some thirty-five LVC documents, including the check disbursement schedule and the electric bill discussed on May 16. He also signed a statement indicating that he had surrendered "all records in my custody, possession or control" including "any records which may be in the physical possession of an accountant [or] attorney of the corporation." In fact, however, Caesar did not produce the five cancelled checks used to buy the vacation home, the contract of sale

for the home, or the Articles of Incorporation and Registry Statement—all documents that contained either the genuine signature of Caesar Gurino or a signature by Salvatore in Caesar's name.

## C. *Procedural History*

In September 1983, based in part upon the electronic surveillance, Angelo Ruggiero, Coiro, Gotti and others, but not the Gurinos, were indicted on charges of drug racketeering and obstructing justice. In May 1985, the same grand jury returned a twelve-count superceding indictment that included the Gurinos among sixteen defendants. Anthony and Caesar each were charged with one count of conspiring to obstruct justice and to harbor a fugitive in violation of 18 U.S.C. § 371, and one count of endeavoring to obstruct justice in violation of 18 U.S.C. § 1503. A trial *en masse* commenced on June 1, 1987, but a mistrial was declared on January 5, 1988. For purposes of a retrial the matter was severed into four cases, one of which is the instant matter against the Gurinos. After a three-week jury trial before Judge McLaughlin in the Eastern District, each was convicted on both counts and sentenced to a five-year term of imprisonment and a $15,000 fine.[1]

## DISCUSSION

On appeal, the Gurinos challenge their convictions on five grounds: (1) that there was insufficient evidence to support the convictions; (2) that the indictment was invalid because the grand jury was misled about the quality of the evidence before it; (3) that the district court erred in permitting testimony about the criminal activity of alleged coconspirators and others; (4) that the district court abused its discretion in curtailing certain cross-examination; and

---

1. Of the three remaining trials, the results were as follows: (1) Gene Gotti and John Carneglia were convicted of running the narcotics enterprise charged in the indictment, and each was sentenced to 50 years in prison. Their convictions were affirmed on appeal, *see United States v. Ruggiero*, 928 F.2d 1289 (2d Cir.1991); (2) Michael Coiro was convicted for his part in the drug enterprise and for obstructing the grand jury investigation, and received a 15 year prison sentence. *His conviction also was affirmed on*

appeal, *see United States v. Coiro*, 922 F.2d 1008 (2d Cir.1991); and (3) Gerlando Sciascia, Joseph Lo Presti and the late Edward Lino were acquitted in February, 1990. Of the others named in the indictment, three are fugitives; one was a fugitive but has been apprehended in Canada and awaits extradition; another pled guilty; the charges against two others were dismissed; and Angelo Ruggiero, whose trial was severed from Gene Gotti and John Carneglia because of illness, *died on December 5, 1989.*

(5) that the district court erred in not charging the defense's theory of the case. We reject these claims and affirm the convictions.

### A. *Sufficiency of the Evidence*

The Gurinos claim that the evidence supporting both the substantive and conspiracy charges was insufficient as a matter of law. This claim may be sustained, of course, only if, viewing the evidence in the light most favorable to the government, no rational trier of fact could find beyond a reasonable doubt the elements necessary for a conviction. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Applying this test, the evidence was easily sufficient.

We address the substantive violations first. In order to obtain a conviction for endeavoring to obstruct the administration of justice under 18 U.S.C. § 1503 the government must prove "that the defendant[s] knew of and sought to influence, impede, or obstruct [a] judicial proceeding." *See United States v. Capo,* 791 F.2d 1054, 1070 (2d Cir.1986). The Gurinos argue that they were unaware of the pending grand jury investigation until May 21, when Woods first served Caesar with a subpoena, and, therefore, their May 16 trip to Pennsylvania cannot be the basis for their conviction. However, there was sufficient evidence for a rational trier to conclude that the Gurinos were aware of the investigation on the 16th. The tape recordings unambiguously indicate that on May 11, hours after Woods attempted to interview Estelle Mitchell, Angelo Ruggiero learned that the grand jury was sitting. Although he was not recorded telling either of the Gurinos about the investigation, the Gurinos and Angelo had a close working relationship, particularly with regard to hiding Salvatore's assets. Indeed, there were several recorded conversations in which the Gurinos and Angelo openly discussed the concealment of Salvatore's property. A reasonable juror could conclude that it was highly unlikely that Angelo Ruggiero did not inform the Gurinos of his reason for sending them to Pennsylvania on May 16.

Moreover, there is ample evidence of obstruction after May 21. First, the Gurinos failed to turn over the Articles of Incorporation and Registry Statement for LVC, as well as the sales contract and the five cancelled checks for the purchase of the Pennsylvania property. Appellants argue that they were unaware that Michael Cowley possessed the incorporation papers. Their October 1983 trip to retrieve these papers belies these contentions, however.

As for the other documents, appellants argue that what Caesar did not surrender on June 10 had been destroyed by May 21. However, a rational juror could conclude otherwise. At trial, a bank officer testified that the LVC bank statements and cancelled checks were mailed to John Cowley. Cowley, although he could not recall the exact contents, testified that he put all the LVC mail into his LVC file where it remained until Caesar picked up the file on May 16. Cowley did recall that the sales contract was in that file. In the taped conversation the night of the 16th, Caesar and Angelo repeatedly referred to "boxes" of documents being reviewed, some of which included LVC papers. Although at the end of this meeting Coiro told Angelo: "Get rid of all of this," there is no indication that any records actually were destroyed. On the contrary, in the May 23 taped conversation, Anthony told Angelo that he was startled to see Woods walk into Arc Heating on May 21, because he "had everything boxed up on the floor." Given that on June 10 Caesar produced the check disbursement schedule and electric bill discussed on May 16, a rational juror could conclude that they, along with the contract, bank statements, and checks were contained in the boxes at Arc Heating on May 21.[2]

Second, with respect to the New Jersey property, the government argues that the Gurinos failed to produce three pieces of

---

**2.** The government obtained copies of these documents from other sources for presentation as exhibits at trial.

correspondence relating to their efforts to retrieve the $25,000. The first was a copy of Lipsman's demand letter to the realtor, forwarded to Salvatore's Tortoise Lane address. The other two were copies of the builder's demand letter to the realtor, one forwarded to Tortoise Lane and the other sent directly to Lou–Roe. At trial, the government introduced copies of these documents. We conclude that there was sufficient proof that the Gurinos withheld at least two of them. In a taped conversation on May 23, Anthony explained that "when [Lipsman] was sending correspondence letters back and forth, he was, he was forwarding, carbon copying to Gurino." A rational juror could thus conclude that the Gurinos possessed and failed to surrender a copy of Lipsman's demand letter. The same is true for the copy of the builder's letter sent directly to Lou–Roe, which the Gurinos operated. As for the copy of the builder's letter forwarded by the realtor to Tortoise Lane, although there is evidence that that residence was "cleared out" by Angelo's associates on May 8, we find nothing linking the letter directly to the Gurinos.

Appellants argue that in light of the fact that Caesar admitted to Agent Woods that Lou–Roe made the $25,000 downpayment on behalf of Salvatore and that Caesar produced a copy of the cancelled check for that payment, withholding of the demand letters cannot be construed as obstruction. However, these letters reveal that the Gurinos were actively seeking refund of the $25,000. The government had good reason to suspect that these funds were derived from illicit activities, and the grand jury thus had an interest in seeing that the funds were not dissipated. Even though there was litigation over the downpayment, the litigation was not in Salvatore Ruggiero's name, and the Gurinos' failure to surrender the correspondence can rationally be viewed as intended to conceal their efforts to recover and liquidate Salvatore's assets.

■ Appellants are correct that the letters would have added little, if any, investigatory value given that Lipsman had surrendered the two March 1982 letters from the realtor. However, 18 U.S.C. § 1503 carries no materiality element. That section "requires only proof of an endeavor, irrespective of its success, and makes that act a crime if the endeavor is a corrupt one." *United States v. Baker,* 611 F.2d 964, 967 (4th Cir.1979); *see also United States v. Friedland,* 660 F.2d 919, 930 (3d Cir.1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2268, 73 L.Ed.2d 1283 (1982). The bottom line thus is that the subpoena unambiguously called for the correspondence—as documents "pertaining thereto" the $25,000 check—and there was ample evidence for a rational juror to conclude beyond a reasonable doubt that the Gurinos possessed at least two of the letters and failed to surrender them in order to obstruct justice.

Third, the appellants took action to liquidate Salvatore's investment in the Dumont Avenue parcels. Anthony litigated to regain title to the property and then transferred it to Vimi in an attempt to turn the investment into cash. Although these activities were done in an open fashion and not in violation of a subpoena, they still can be reasonably construed as efforts to liquidate Salvatore's ill-gotten assets before authorities could trace and seize them. This too, therefore, was an effort to obstruct the grand jury's investigation.

■ As for the sufficiency of the evidence supporting the conspiracy violation, we need say little. The record is replete with recorded conversations between the Gurinos, Anthony Ruggiero and others, both before and after May 21, in which they discuss plans to cover up their links to Salvatore. A rational trier would have difficulty not concluding that there was proof beyond a reasonable doubt of an organized, concerted effort to thwart the grand jury investigation.

## B. *The Indictment*

The Gurinos also argue that the indictment should be dismissed because the grand jury was misled about the quality of the evidence it received. At the hearing preceding the 1985 superseding indictment, instead of playing the entire set of tape

recordings that were the product of the electronic surveillance of Angelo Ruggiero's home, the prosecutors presented oral summaries of those recordings through the testimony of FBI Agents Woods, Donald McCormick, and William Noon. The Gurinos allege that in two instances Woods exaggerated the actual contents of the tapes, and that prosecutors inadequately advised the grand jury that the tapes were difficult to understand and that it had a right to hear the tapes if it so desired. Relying on *United States v. Estepa*, 471 F.2d 1132 (2d Cir.1972), and *United States v. Hogan*, 712 F.2d 757 (2d Cir.1983), appellants made similar arguments in moving to dismiss the indictment prior to trial. On December 7, 1988, Judge McLaughlin denied the motion in an oral decision, stating, "nothing occurred before the grand jury, that even begins to approach the outrageous conduct disapproved in *Estepa* and *Hogan*." We agree with Judge McLaughlin's assessment.

■ It is entirely permissible for the government to use hearsay evidence in its presentation to the grand jury. *See United States v. Torres*, 901 F.2d 205, 233 (2d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). However, the use of hearsay evidence before a grand jury may render an indictment invalid if (1) the government misleads the grand jury into thinking it is receiving firsthand testimony when it is in fact receiving hearsay or (2) if there is a high probability that the defendant would not have been indicted had only nonhearsay evidence been used. *See id.* The first ground is designed to prevent prosecutorial impairment of the grand jury's independent role, and the second is intended to eliminate prejudice to the defendant. *See Hogan*, 712 F.2d at 761.

Thus, in *Estepa*, we dismissed the indictment because the prosecutor failed to advise the grand jury of " 'the shoddy merchandise they [were] getting so they [could] seek something better if they wish[ed].' " 471 F.2d at 1137 (quoting *United States v. Payton*, 363 F.2d 996, 1000 (2d Cir.) (dissenting opinion), *cert. denied*, 385 U.S. 993, 87 S.Ct. 606, 17 L.Ed.2d

453 (1966) ). *Estepa* involved an indictment for narcotics violations based solely on the testimony of a police officer who, unbeknownst to the grand jury, had glimpsed from a remote location only a portion of the alleged drug transactions and filled in the rest of his narrative, including statements purportedly made by the defendants, with hearsay without disclosing his lack of firsthand knowledge. *See id.* at 1134–35. In *Hogan* we dismissed an indictment for narcotics violations because the prosecutor prejudiced the defendant by characterizing him as a "hoodlum" who should be indicted as a "matter of equity" and a "suspect" in two murders and a bribery scheme, when he in fact had never been charged with those offenses. *See* 712 F.2d at 761–62.

■ In contrast to *Estepa* and *Hogan*, the government fully informed the grand jurors in the instant matter of the nature of the evidence they were considering, the availability of the primary sources of evidence, and of their independent fact-finding role. On April 30, 1985, at the outset of the hearing for the superceding indictment, the prosecutor instructed:

I preface my remarks by telling you that available are the transcripts of taped conversations some of which were made for you back during the original presentation. Not only are you permitted to examine the transcripts of the tapes but you are also entitled to ask that those tapes be played for you as well if you find it necessary. So, keep in mind at any time today or in subsequent proceedings dealing with this presentation. Again, it's your recollection of the facts both from the witnesses that you will be hearing and from the transcripts that you have heard read to you or will read yourself that counts. What I say is not evidence. I might summarize for you, you are not bound by that summary. It is your recollection and/or your reading upon which you must base any decision asked from you.

Moreover, a review of Woods's testimony before the grand jury demonstrates that he identified the limits of his personal knowledge, the sources of hearsay, the sources

of documents available for inspection by the grand jury, and the summary nature of his testimony concerning the recorded conversations.

The Gurinos argue that Woods twice summarized the transcripts inaccurately, once by indicating that the tapes contained a statement by Anthony Gurino that the three boxes at Arc Heating contained subpoenaed documents, and once by indicating that the conversants said that Salvatore had "dealt a half million dollars worth of drugs in that past year." Moreover, they complain that the grand jurors were not advised as to the poor audibility of the tapes. These arguments are quibbles. Anthony was admittedly surprised upon being visited by Woods at Arc Heating and was worried about the presence of the boxes of documents, and Salvatore was a fugitive wanted on narcotics charges. Neither remark by Woods added much to the facts, therefore. As for the quality of the tapes, the grand jury did listen to a portion of the recordings during the testimony of Noon and was thus in a position to consider the audibility firsthand. In any event, any possibility of prejudice was eliminated by the petit jury's conviction of appellants after hearing the tapes in their entirety. *See United States v. Mechanik*, 475 U.S. 66, 70, 106 S.Ct. 938, 941, 89 L.Ed.2d 50 (1986); *Torres*, 901 F.2d at 233.

### C. *Alleged Trial Errors*

The Gurinos claim that a new trial must be granted on three grounds. First, they argue that the district court erroneously admitted prejudicial testimony concerning the criminal activity of the Gurinos' alleged coconspirators and others. Second, they claim that the district court abused its discretion by curtailing the cross-examination of certain government witnesses. Third, they contend that the district court improperly failed to charge the jury on the defense's theory of the case. Each claim is meritless.

### 1. *Testimony about Criminal Activity*

■ At trial, FBI Agent Andris Kurins testified on direct examination that on May 14, 1982, he and other agents surveilled a memorial service held for Salvatore Ruggiero. Kurins identified several photographs that he had taken at the service, depicting, among others, Moscatiello, Angelo Ruggiero, and the Gurinos. On cross-examination, defense counsel asked a host of questions casting doubt on the propriety of the FBI's presence at the service, including whether Kurins had been taking pictures inside the church or of women and children. On redirect, over objection, Kurins explained the law enforcement purpose for the surveillance. He testified that the memorial service represented a unique opportunity to observe together many individuals who had been arrested for drug offenses and other violations. From photographs, he identified approximately twenty such individuals. He also explained that the service afforded investigators a chance to learn the extent to which Angelo Ruggiero had assumed his deceased brother's narcotics business.

After a short recross, defense counsel moved for a mistrial on the ground that the testimony about the prior arrests was prejudicial. Judge McLaughlin denied the motion, ruling that defense counsel had opened the door to the testimony by placing at issue the propriety of the FBI's presence at the service. This ruling was in no way an abuse of discretion. *See United States v. DiTommasso*, 817 F.2d 201, 217 (2d Cir.1987). On cross-examination, defense counsel repeatedly suggested that the FBI acted improperly and immorally by observing the memorial service, and it was therefore entirely appropriate to allow the government to respond to this misimpression by having Kurins testify as to the reasons for the surveillance, including prior arrests.

■ The Gurinos argue further that the district court prejudiced them by admitting evidence of Salvatore and Angelo Ruggiero's narcotics activities. Appellants are correct that they were not on trial for narcotics offenses and cannot be convicted for mere association. However, that was not the case here. The Gurinos were charged with conspiring and endeavoring

to obstruct a grand jury investigation into "racketeering, narcotics trafficking, harboring a fugitive, and concealment of monies and other ... property illegally gained from the commission of crimes by Salvatore Ruggiero and others." Salvatore's and Angelo's narcotics activities were thus relevant to the Gurinos' motive for obstructing justice. *See, e.g., United States v. Brennan*, 798 F.2d 581, 589 (2d Cir. 1986); *United States v. Harris*, 733 F.2d 994, 1006 (2d Cir.1984). The district court did not abuse its discretion in its implicit determination that this probative value outweighed any possible prejudicial effect. *See* Fed.R.Evid. 403; *United States v. Terry*, 702 F.2d 299, 318 (2d Cir.), *cert. denied*, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983).

## 2. *Curtailment of Cross–Examination*

On cross-examination, defense counsel asked Woods whether he could recall the exact contents of the LVC folder that Caesar Gurino produced on June 10, 1982. When Woods answered affirmatively, defense counsel asked him to name each of the thirty-five documents by memory. Judge McLaughlin disallowed the request for such a recitation and instructed defense counsel to ask specific questions about particular documents.

■ Appellants argue that this ruling was an abuse of discretion because, if Woods could not name the documents, then this "would have constituted a serious defect in the prosecution's proof," whereas, if he could name the documents, then the jury would have had a better idea of the extent to which the Gurinos complied with the LVC subpoena. This argument is frivolous. Woods already had identified the general nature of the documents on direct examination, and the government already had introduced various documents that Caesar produced. Woods's ability to remember each document after six years was thus irrelevant. Moreover, if defense counsel wished to emphasize other documents the Gurinos produced in accordance with the subpoena, they could have introduced those documents into evidence themselves.

■ Also on cross-examination, defense counsel showed Woods two letters produced by Salvatore Ruggiero's lawyer, Richard Lipsman, concerning the New Jersey property. Both were from the realtor, one acknowledging Lipsman's demand for return of the $25,000 downpayment and the other informing him that the money was being placed in escrow. Lipsman had surrendered the letters to Woods in the presence of attorney Neal Comer, who eventually represented the Gurinos. Judge McLaughlin sustained the government's objection to the introduction of these letters. Appellants argue that this was error on the theory that, if Comer had told Caesar that Lipsman had already produced evidence of the Gurinos' efforts to retrieve the $25,000, they would have been unlikely to withhold similar documents. However, as the district court noted, there was no evidence that Caesar Gurino knew what Lipsman had produced. It was thus not an abuse of discretion to deny admission. In any event, any prejudice from the court's denial was cured when the letters in question were admitted into evidence through Comer.

## 3. *Jury Charge*

The Gurinos contend that the district court improperly refused to instruct the jury as to their theory of defense on the substantive obstruction count. At trial, they proposed a charge that emphasized that a defendant may not be convicted for failing to surrender documents not in his possession:

A knowing and willful failure to turn over documents requested by a grand jury can constitute an endeavor [to obstruct the grand jury]. The requirement that you find that the defendant acted knowingly and willfully means that you must consider, however, (1) whether the defendant had such documents in his possession, (2) whether he knew that any documents he had were the documents requested in the subpoena; and (3) whether he deliberately withheld those documents from the grand jury with the specific intent to impede its investigation. In other words, you may not convict a

defendant if he did not have the documents in his possession. Similarly, even if you find he had such documents in his possession, you may not convict him if his failure to produce them for the grand jury was prompted by confusion, an oversight, haste, carelessness, inadvertence, or an honest mistake of facts.

The district court did not agree to this proposed instruction. Before the actual charge was given, the Gurinos were given an opportunity to object on this ground, but did not do so. On appeal, appellants argue that they preserved their request for a charge reflecting the theory of their defense by submitting a memorandum of law in which they again pressed their requested instruction. Yet it is not clear whether this memorandum, which was never entered on the district court docket sheet but appears in the parties' joint appendix on appeal, was ever submitted to the district court, whether before, during or after the charge conference. Nonetheless, even assuming that appellants properly objected to the court's charge "before the jury retire[d] to consider its verdict, stating distinctly the matter to which [appellants] object[ed] and the grounds of the objection," Fed.R. Crim.P. 30, there was no reversible error in rejecting appellants' proposed instruction.

■■■ Although a defendant is entitled to a jury charge reflecting his theory of defense, that theory must have a valid basis in law and fact. *See United States v. Durham*, 825 F.2d 716, 719 (2d Cir.1987). In this case appellants' proposed instruction was technically correct—possession is necessary element of the offense—but omitted qualifications crucial in the factual context of this case. First, as in the case of the LVC documents, constructive possession is sufficient. Second, destroying documents in anticipation of a subpoena can constitute obstruction. Appellants' proposed charge, in the instant circumstances, was potentially misleading and properly rejected. Moreover, as appellants admit, the charge actually given properly and completely explained the necessary elements of endeavoring to obstruct a grand jury investigation. We thus find no error warranting a new trial.

## CONCLUSION

For the reasons stated above, the judgments of conviction for both appellants are affirmed.